Moore agt. Moore.

———◆◆———

## COURT OF APPEALS.

MICHAEL P. MOORE, Executor of the last Will and Testament of LEWIS MOORE, deceased, appellant agt. JOHN L. MOORE and others, respondents.

Where a bond and mortgage are executed by husband and wife on the wife's separate estate for the benefit of a third person, the *mortgaged premises* constitute the *primary fund*. The *bond* is not a debt against the husband or his estate; he being merely tenant by the curtesy is not bound to discharge the incumbrance. .

Where a practicing physician, a son of the testator, who acted also as the agent of his father for many years before his death, (for which he was allowed $500 per year,) and was acting executor of his father's estate, instituted a claim, on a final accounting as executor, for *professional services* for his father during four years previous to his death amounting to $3,300,

*Held,* that it was very manifest from the whole case that the services were rendered and performed as acts of gratuitous kindness and affection, and that it was neither expected on the part of the father, nor intended on the part of the son, at the time of their rendition, that the latter was to be pecuniarily compensated ; the charge was disallowed. *(An instructive case as to the facility and ingenuity of raising claims against an estate, where an executor is pressed for a final accounting.)*

*Albany, September term,* 1860.

THIS is an appeal brought by Michael P. Moore, executor of Lewis Moore deceased, from a judgment of the supreme court of the first judicial district, entered on the second day of June, in the year 1859, affirming the decree of Mr. Surrogate Alexander W. Bradford made on the 24th day of December in the year 1855. The proceedings were commenced before the surrogate of New York, in the year 1846, by John L. Moore, and George Fair to compel Michael P. Moore the executor of Lewis Moore, deceased, to render a final accounting of his proceedings as executor. The surrogate decreed against the executor for the sum of four thousand six hundred and eight dollars and ninety-nine cents, from which Michael P. Moore, the executor appealed to the supreme court and from the supreme court to this court.          *          *     .     *          *

JAS. T. BRADY, *counsel for the executor and appellant.*
THOMAS C. T. BUCKLEY and JAMES A. MOORE, *counsel for the respondents.*

By the court, WRIGHT, Judge.   The testator died in June, 1843, at his residence in New Jersey, leaving personal estate of the value as set out in the inventory exhibited by the executor to the surrogate of the county of Bergen, of over $15,000. It consisted of cash, promissory notes, household furniture, and farm stock and produce. And there was nothing in the nature or condition of the property to give to the administration of the estate an unusual character. Independent of the personal claims of the executor, the

debts of the testator amounted to only $800, and the only
debt claimed in October, 1843, to be due to such executor
was for his service as agent for the testator, amounting to
$2,500; yet for twelve years after the filing of the inventory
the accounts of the executor remained unsettled, and
although parties interested in the estate instituted proceed-
ings before the surrogate of New York, for a final account-
ing as early as November, 1846, owing to the obstacles
mainly interposed by the executor, a decree was not made
until December, 1855. Any complication in the case grew
out of personal claims, from time to time interposed by the
executor, and his efforts to have the real estate of the tes-
tator sold. As early as October, 1843, and before exhibit-
ing an inventory he applied to the orphans' court of the
county of Bergen in New Jersey, for leave to sell the real
estate of the testator, for the payment of debts, which
application was denied. The application was renewed in
April, 1844, before the surrogate of the county of New
York, and in September, 1845, again denied; and on appeal
to the supreme court, the surrogate's order was affirmed.
It was during the pendency of this latter proceeding that
the executor first introduced a claim against the estate for
medical services rendered to the testator during the years
·1839, 1840, 1841 and 1842, amounting to the sum of $3,300,
and also his agency account and claim for services and dis-
bursements as agent, to the amount of $2,700. In the agency
account as he made it up, he charged himself with the sum
of $1,660, the proceeds of a mortgage of one Wilkes, which
belonged to the testator and had been foreclosed in 1842,
under the direction of the agent. The purchaser of the
property at the foreclosure-sale it would appear from the
proofs, never actually paid the agent the purchase money or
at least, not in full. On the proceeding for a final account-
ing the executor claimed to be allowed, also the sum of
$4,518.37, moneys alleged to have been paid for principal
and interest, prior to the testator's death, and for interest

subsequent thereto on the testator's bond to the United States Fire Insurance Company, accompanying a mortgage given on the separate property of the testator's wife to secure the sum of $10,000. The surrogate in making up the agency account with a view of ascertaining its condition at the death of the testator deducted the amount of the Wilkes' mortgage ($1,660) from the gross sum charged the appellant in his account as agent, and disallowed in such account, moneys charged against the testator's estate as paid to the fire insurance company. The appellant was then allowed the sum of $2,500, ($500 per annum,) for his services prior to the death of the testator, which left the estate indebted to him at the decease of his father in respect to the agency, in the sum of $1,309.71. The claim of the executor for services rendered by him as physician to the testator was disallowed by the surrogate. In the petition of appeal to the supreme court, the executor alleged that the surrogate's decree was erroneous in, 1st, disallowing his account of $3,300, for services as physician to the testator; 2d, disallowing the sum of $1,660, the amount of what is called in the decree, "the Wilkes' mortgage;" and 3d, disallowing the sum of $4,518.37, paid by the petitioner to the United States Fire Insurance Company. These alleged errors were alone the subjects of examination in the supreme court, and must, I think, necessarily be on this appeal. I will briefly examine them.

*1st. In respect to the claim growing out of the Wilkes' mortgage.* This ground of appeal proceeded upon a misconception of the decree; an examination of the decree will show that the appellant was credited therewith and allowed the sum of $1,660 as the proceeds of the Wilkes' mortgage, with which he had charged himself in making up the debit side of the agency account. On the argument at bar, the appellant's counsel admitted the allowance by the surrogate, but insisted that interest upon the sum should also have been allowed, and in this respect there was error. It is a

sufficient answer that the claim of interest is not included in the statement of appeal on this point. But if it had been, interest was not allowable. The appellant advanced no money to obtain the property covered by the Wilkes' mortgage, as the agent of the testator, he was in possession of the mortgage covering property in the city, and in 1842, proceeded to foreclose it; at the foreclosure sale in April, 1842, the property was bid in by one Aitkin, a friend of the appellant for $1,660, and the proof leaves strong reasons to believe by concert with, and for the benefit of the latter. The evidence satisfactorily establishes the fact that the sum of $1,660, was an inadequate price for it. The appellant made no payment of the purchase money, other than by charging himself with the amount in the agency account with the testator. After the sale he collected the rents, applying them to his own purposes, and in June 1843, (twelve days after the death of the testator,) Aitkin conveyed the premises to him. Instead of any just claim for interest or money advanced for the benefit of the testator, it is apparent from the account of the transaction given by the appellant himself, it was nothing but a successful speculation of the agent at the expense of the principal. Between the agent and Aitkin, the testator's estate has lost the fruits of the mortgage, and instead of paying the former interest, for money never advanced, he ought to account to his father's estate for the amount of Aitkin's bid at the foreclosure sale.

2d. *As to the claim for moneys paid to the United States Fire Insurance Company.* The facts on which the claim is founded, were substantially these. The testator's wife and the mother of the executor, as heir-at-law of Stephen Price was interested in one half of No. 104 Broadway, and one half of No. 52 Courtland street, and in September, 1840, she, with her husband, conveyed the same to the appellant. From that time, neither the testator nor his wife had any interest in the property. The property was subject to a

mortgage to Henry H. Watson, on which was due in February, 1841, $10,000 of principal, besides interest and which was being foreclosed. The appellant applied to the testator to raise $10,000, for him to pay off the mortgage, and it was arranged to raise the money by mortgaging premises No 82 John street, the separate property of the testator's wife, and in which the testator had no interest, except as tenant by the curtesy, the appellant promising to keep down the interest and pay off the mortgage as soon as he could. It would seem that the appellant had ascertained that he could procure the money from the insurance company, if secured by a mortgage on the John street property, for he and the counsel for the company upon the application being made, went over to Hackensack to see the testator, who was infirm, having provided themselves with a blank power of attorney to be executed by the testator to the appellant to borrow the money, execute a bond for its payment in the name of the testator, upon such terms and at such times, as the attorney should see fit, and also in the testator's name, to execute a mortgage in conjunction with his wife on the John street property. The $10,000 was procured from the insurance company, the appellant as the attorney of the testator, and the testator's wife, executing the mortgage; and the appellant also as such attorney, executing in the name of the testator the bond accompanying the mortgage. The appellant received the money from the insurance company, and with some $1,146, provided by himself, purchased an assignment of the Watson bond and mortgage. The foreclosure suit was suffered to proceed, and the mortgaged premises at the master's sale, bought in, in the name of the testator, the appellant conducting the entire business. In June, 1841, shortly after the conveyance of the property, by the master conducting the sale, to the testator, the latter with his wife, conveyed it to the appellant, the consideration expressed in the deed being $11,148, the sum paid for the assignment of Watson's

mortgage. ·There was really nothing paid to the testator by the appellant, and in his examination before the surrogate, he pretended that the deed was a gift from his father. The effect of the transaction was to release the property in Broadway and Courtland street, one half of which was owned by the appellant, from the operation of the Watson mortgage, and then, as such mortgage was given by Price, the original owner, to vest an unincumbered title, to the property, in the appellant. During the lifetime of the testator, the ˙appellant paid the interest, and $3,000 of the principal of the mortgage held by the insurance company, and at home, when it was talked of by the testator and his wife, he assured them, he was paying it off as fast as he could, and repeatedly promised to discharge it altogether; he also paid the interest for two or three years after the testator's death, he made no charges of these payments against the testator in his books of account, and there can be no pretence from the proof, that they were made as agent for the testator in his lifetime, or as executor after his death. He informed his mother that he had paid $3,000 of the principal of this mortgage, and on several occasions assured her that she should never loose a dollar by it. He finally stopped paying interest on the mortgage in 1846, assigning as a reason to his mother that as there was difficulty in the family, he would wait until the business was arranged, and then he would settle with her. It was the moneys amounting to $4,518.37, thus paid to the insurance company for a part of the principal and accruing interest on a mortgage on the separate property of the testator's wife, and which the appellant was equitably bound to pay and discharge, that he sought to establish as a claim against the testator's estate, and which the surrogate disallowed. The surrogate excluded the claim from the accounts on the ground that as between the executor and testator, the executor was bound to have paid off and discharged the mortgage. I cannot entertain a doubt of the correctness

of the decision. The mortgage was given at the request, and for the accommodation and exclusive benefit of the executor, and on his undertaking to pay it off. The history of its origin, and the application of the money raised thereby point only to this conclusion. The appellant individually and not as the agent of his father, applied to the company for the loan, that he might purchase the Watson mortgage, that was an encumbrance on his Broadway and Courtland street property. The testator had no interest in such purchase, nor had he any occasion to borrow money for any purpose. The appellant induced his mother to create a lien upon her separate estate, and his aged and infirm father to consent to accompany the mortgage with his bond to raise money for his exclusive benefit, on his undertaking to pay off and discharge the mortgage; under the circumstances it seems very clear that the appellant was primarily liable for the amount of the mortgage. And this is the view he seems to have taken of it himself, until after his father's death, and a difficulty had arisen between him and others of legatees and next of kin, in respect to the administration of the estate of the testator. The moneys he now seeks to charge against his father's estate, even in the lifetime of the latter, were paid by him individually, and not as the agent, or at the request of his father, and he voluntarily reduced the lien on his mother's estate to $7,000, and repeatedly promised her, that he would soon discharge it altogether. Instead of allowing the payments thus made in his account as agent, or executor, or as a creditor of his father, I think that the estate of his mother, is entitled to be relieved wholly from the lien. Besides if it could be pretended, in view of the facts proved, that the moneys were paid in the character of attorney, or executor, it was incumbent on the appellant to show that they were paid on some valid claim against his father's estate. The presumption created by the fact of their being paid on the testator's bond, is rebutted by the other facts in the case. This

bond (the appellant being the borrower of the money,) was not a debt against the testator, for he being only a tenant, by the curtesy, was not bound to discharge the incumbrance on his wife's estate; the land constituted the primary fund. This money which the appellant paid was in discharge of his own obligation to his mother, on the faith of which she assented to mortgage her property.

3d. *As to the claim for services as physician to the testator.* In October, 1843, four months after the death of the testator, the appellant applied to the orphan's court in New Jersey for leave to sell the testator's real estate to pay debts. The statutes of that state made it the executor's duty, on such an application, to exhibit under oath a just and true account of the testator's personal estate and debts, as far as he could discover the same. In compliance with this provision he presented a sworn account of all the debts he was then able to discover against the testator. The account included a claim of the executor for services as agent of his father, amounting to $2,500; but none whatever for medical services was mentioned or referred to. If the latter claim existed at all, it existed then, and his omission to make it at that time is conclusive that he did not then consider that he had any claim; he solemnly declared under oath in effect that no such claim existed. The omission is not consistent, as urged by counsel, with the appellant having overlooked the claim; he did not overlook his claim as agent, which was much the largest debt against his father in the account, and it is absurd to assign as a motive for his conduct, that he had not then definitely resolved to assert his claim as a physician. If he knew, or supposed, that he had any just or legal claim, he was bound to assert it when called on, under oath, to state all the debts of the testator; and if he omitted to state any debt due to him for services as a physician, it was equivalent to an admission in the most solemn way, that his father owed him nothing for any professional services he might have

rendered, but that such services were gratuitous, and without any understanding or expectation on either side, when being rendered, that any pecuniary recompense was to be made therefor. Yet, some six months afterwards, an account running through the years 1839, '40, '41, and '42, for medical services, is trumped up, averaging the sum of $825 per annum. Of course the precise time when the professional visits were made is not given, (nor was there any attempt at any such kind of proof,) as the appellant, though keeping books of account of services in a professional capacity, had no charge against his father on such books, for the reason, doubtless, that he had never regarded himself as visiting him in the character of a physician, or rendering any medical services with the intention of making any pecuniary charge therefor. Dr. Stephenson, of Hackensack, was the family physician, and attended the testator in that capacity before and after the latter became bedridden. Judge Moore, the testator, who had been an active man, began perceptibly to fail in 1838, but it was not until after a sort of apoplectic attack in 1840 that he took to his room and bed. From that time he was what Dr. Stephenson called a bed-ridden man, and a gradual prostration of mind and body went on until his death in June, 1843. No remedies were given him except of a strengthening nature, and no physician called, except when the family became alarmed at a slight recurrence or two of an attack similar to that which rendered him temporarily helpless in 1840. On the occasion of the attack in 1840, Doctor Stephenson consulted with the appellant in respect to his father's condition, when he expressed the opinion that the only ailment of the latter was old age, and that medical treatment was useless, as he was broken down, and would die. The opinion was probably correct in the main, and there is no proof whatever that then, or any time afterwards, the appellant advised or suggested any medical treatment. But the testator did not die until three years afterwards, and then not

from any acute disease, but from mere physical exhaustion. During the years 1839, '40, '41 and '42, the appellant, though residing in New York, (twelve miles distant from his father's residence) was often at home. The aged parents seem to have reposed unlimited confidence in him, and always listened favorably to any suggestions for the advancement of his interests. In 1838 he had been intrusted by the testator with the entire management of his property in New York and New Jersey, with the exception of the homestead; and during the years in which the medical bill is alleged to have accrued, he received and disbursed, according to his own account, over $20,000 of the testator's funds. This agency occasioned frequent visits to Hackensack; so, also, the appellant was there frequently on business of his own; and it was a common occurrence, though having no special business, for him to visit home on Saturday and return to the city on the following Monday. Indeed, at times he would bring his carriage with him and visit patients in the neighborhood, making his father's house his headquarters. In short, he was in the habit of visiting the country residence of his father whenever business or inclination dictated, and consulted nobody but himself as to the time of his arrival or departure. The month before the testator's death he actually removed to Hackensack, being somewhat out of health, and became a member of the testator's family, continuing there sometime after the death of the testator. In December, 1841, he induced his father to execute an agreement in writing, to allow and pay him $500 per annum for his services from the time he took charge of the testator's business in 1838. The proofs utterly failed to show more than two or three instances where he was sent for by the testator's family to attend as a physician; and, even in these cases, it is doubtful whether he was not rather summoned, with the other children, to attend the supposed dying bed of his father. Undoubtedly, when at home, on the occasions referred to, during

the three years that the testator was bed-ridden, he rendered much service, strictly of a professional nature. He attended his father's sick bed, and occasionally administered strengthening remedies, and, it may be, that the almost imbecile patient confided in him to a greater extent than in his regular physician; but it is very manifest, from the whole case, that the services were rendered and performed as acts of gratuitous kindness and affection, and that it was neither expected on the part of the father, or intended on the part of the son, at the time of their rendition, that the latter was to be pecuniarily compensated. In December, 1841, (after two-thirds of his pretended medical bill had accumulated,) instead of making any claim or demand for medical services, or intimating an intention to do so, he procured from his father an instrument in writing, agreeing to allow and pay him a salary of $500 a year of the testator's funds, which salary was allowed to him by the surrogate for five years, including the time of the running of the alleged medical account. The appellant made no charge in his books for any professional service rendered to his father, though every dollar of money disbursed, and every act performed as agent, was carefully noted. He made no claim or demand for compensation in the lifetime of the testator for professional attendance, but, on the contrary, assured his mother and the family that he had no such intention, giving them to understand that such services were rendered gratuitously. After the testator's death he did not pretend to have any claim, but, in effect, declared in the most solemn manner that he had none. He should be held to his declarations and not be permitted, in the exercise of a hostile feeling, engendered against his brothers and sisters, to saddle his father's estate with a debt for services that had been gratuitously rendered. Nothing is clearer than that the appellant did not intend at the time to make any pecuniary charge ; nor was there any agreement or mutual expectation by himself, or his father, that he was to be

paid for professional attendance; but the whole claim was an after-thought, urged and asserted only for vindictive purposes. The appellant has never pretended that there was any agreement or understanding between his father and himself to pay for professional services. He places his right to recover on showing that he rendered meritorious and valuable services, which were accepted by the testator. Ordinarily from the fact of rendition and acceptance of services, beneficent in their nature, the law will imply a promise to pay what the services are reasonably worth. This implication may not be repelled wholly by the fact that the service is rendered to a parent by a son of full age; but the legal presumption of an obligation to pay is less strong when the relation of parent and child exists, than in the case of dealing between persons not bound to each other. If, to the relationship, be added other circumstances tending to show, as a matter of fact, that the services were gratuitously rendered, and without any expectation at the time on either side that payment was to be made, the law will not imply a contract for compensation. A person cannot perform services, intending them to be gratuitous, and with a tacit understanding that no pecuniary charge is to be made, and afterwards recover on a *quantum meruit* for such services. In my judgment this is precisely the character of the claim of the appellant for professional attendance. It was intended and understood in the lifetime of the testator that the services were gratuitous. It was so understood for months after the testator's death. The appellant virtually admitted in October, 1843, that he had no legal claim of the kind; and even in 1844, when his mother remonstrated with him as to his course, he justified himself, not on the ground that there was any merit in his claim, but having the law on his side, as he supposed, he meant to punish his brothers and sisters for their ill treatment of him, by a personal appropriation of a large share of his father's estate, which rightly be-

longed to them.   Surrogate McVean, in 1844, on the appli-
cation to sell the testator's real estate, held this claim for
medical services to be fictitious; and surrogate Bradford,
on the final accounting, reached the same conclusion.   No
intelligent or fair minded judge, ·I think, can carefully
examine the whole case, without cordially assenting to the
justice and propriety of the decision.   It can only properly
be regarded as an unwarrantable attempt by the executor
to make himself a creditor of his father's estate to a large
amount, by the interposition of a claim for services that,
'at the time, were gratuitously rendered, if rendered at all,
to anything like the extent claimed.

The judgment of the supreme court should be affirmed,
with costs.