quest, as required by the Code, the judgment should be reversed, and a new trial ordered.

Judgment of the municipal court reversed and new trial ordered, costs to abide the event. All concur.

---

### DEEGAN v. METROPOLITAN ST. RY. CO.

(Supreme Court, Appellate Term. April 16, 1900.)

APPEAL—QUESTIONS OF FACT—CONFLICTING EVIDENCE.

Where the only questions involved on appeal arise from a determination of the facts, as to which there was a conflict of testimony, and there was evidence to warrant the finding, the judgment of such court will not be disturbed.

Appeal from municipal court, borough of Manhattan. Ninth district.

Action by Dennis Deegan against the Metropolitan Street-Railway Company to recover damages. From a judgment in favor of defendant, plaintiff appeals. Affirmed.

Argued before BEEKMAN, P. J., and GIEGERICH and O'GOR-MAN, JJ.

La Fetra & Glaze (E. B. La Fetra, of counsel), for appellant.
Henry A. Robinson and John T. Little, Jr., for respondent.

GIEGERICH, J. The only questions involved upon this appeal arise from a determination of the facts, as to which there was a conflict of testimony. The finding of the justice in favor of the defendant is warranted by the evidence, and we see no reason for disturbing such determination in the absence of the elements which are requisite to a review of the facts. Lynes v. Hickey, 4 Misc. Rep. 522, 24 N. Y. Supp. 731. As we are unable to discover any ground for disturbing the judgment, it should be affirmed, with costs.

Judgment affirmed, with costs. All concur.

---

(50 App. Div. 4.)

### MURR v. WESTERN ASSUR. CO. OF TORONTO.

(Supreme Court, Appellate Division, Fourth Department. March 21, 1900.)

1. INSURANCE—REPAIRS—POSSESSION OF PROPERTY—QUESTION FOR JURY.

Defendant, pursuant to the terms of a policy issued by it to plaintiff on his canal boat, caused repairs necessitated by an accident to the boat to be made thereon in conformity with specifications reported by surveyors, and paid therefor; but the repairer with whom defendant contracted for the repairs, and to whom it turned over the boat for that purpose, made extra repairs, not required by the specifications, and in no way chargeable to the accident, yet proper to make the boat suitable for use. *Held*, that the question whether the repairer had the possession of the boat by joint direction of the parties, so as to exempt defendant from liability for the repairer's refusal to surrender to plaintiff, because of the latter's failure to pay for the extra work, was, at most, a question of fact for the jury.

2. PRINCIPAL AND AGENT—POWER OF ATTORNEY—CONSTRUCTION.

A power of attorney given by an insured, whose policy permitted the insurer to make repairs on the property in case of an accident thereto, in

conformity with specifications reported by surveyors, authorizing the grantee to act for him "in all matters pertaining to holding survey and repairing damage done to my canal boat in consequence of" a certain accident, limits the power of the grantee to the reparation of damages caused by the accident, and an agreement by him with the repairer employed by the insurer for extra work exceeds his authority.

**3. TRIAL—CREDIBILITY OF EVIDENCE—QUESTION FOR JURY.**

Where a decision for plaintiff is reversed on appeal because of certain testimony of his own witness, on which the case turned, and on a second trial such witness gives contrary testimony, apparently to meet the exigency, it is error to direct a verdict for defendant, notwithstanding collateral circumstances strongly confirming the testimony as originally given, since the credibility of witnesses must be first passed on by the jury.

**4. TROVER AND CONVERSION—NECESSITY OF TENDER.**

Where one claiming a lien on property refuses to surrender it, except on payment of a larger sum than is due, an actual tender of the amount due need not be shown in an action for its conversion.

McLennan, J., dissenting.

Action by Charles Murr against the Western Assurance Company of Toronto for the wrongful conversion of a canal boat. A verdict was directed for defendant for no cause of action, and the exceptions of plaintiff were ordered heard in the appellate division in the first instance. Reversed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WILLIAMS, and LAUGHLIN, JJ.

Simon Fleischmann, for plaintiff.

George Clinton, for defendant.

SPRING, J. In 1896 the plaintiff owned a canal boat in use on the Erie Canal, which was insured by defendant in the sum of $1,700. On August 9, 1896, the boat ran against some concealed rocks in the canal near Pendleton, in the county of Niagara, and was badly injured. It was loaded with 8,000 bushels of wheat, which became water-soaked and swelled, causing the boat to spread apart about three feet. The plaintiff promptly notified the defendant of the accident, and the next day its agent came from Buffalo, and took possession of it for the purpose of making repairs, and it was towed to Buffalo. By the terms of the policy it was provided that, in case disaster befell the boat, the defendant should select one surveyor and the plaintiff one to ascertain and report by specifications in writing, under oath, "both the amount of the work and the manner in which it shall be done to make said vessel good for any damage caused by the disaster without making good defects caused by rottenness"; and for the latter defects, if they were essential, and so reported by the surveyors, the whole expense thereof was to be borne by the assured. The policy provided also for the way in which the repairs should be made. It further provided that no partial loss should be paid by the insurer unless in excess of $100, and, if the repairs cost to exceed that sum, $100 thereof should be paid by the assured, which was designated "Particular average, $100.00." Surveyors were chosen by the parties, and specifications duly prepared by them, and the repairs

were made in conformity therewith. The repairs were made by one Murphy, and in connection therewith he did extra work regarded as advisable to make the boat seaworthy, and the bill for these amounted to $319.72, and it was this extra work which gave rise to the controversy between the parties. It is undisputed that the specifications made by the surveyors did not include those made by Murphy for extra work. There is no pretense, therefore, that the defendant ever expected to pay for these repairs; and it is likewise patent that the extra repairs were due to the inherent decay of the timbers, and in no way chargeable to the accident, and yet were proper to make the boat suitable for use. The case, therefore, presents this somewhat anomalous situation: The boat came lawfully into the possession of the defendant to make the repairs consequent upon the disaster. The defendant complied substantially with the conditions of the policy it issued to plaintiff, causing the repairs to be made in conformity to the specifications, and paying therefor. The possession of Murphy was its possession, constructively, and the warrant for it was solely the necessity for repairing the boat. The plaintiff ordinarily would be entitled to the return of his boat upon paying his average of $100. But other repairs were made by Murphy, who was in actual possession. If they were made under proper employment or authority, then he had a right to retain the possession of the boat until his claim was paid. These deductions are elementary. If Murphy declined to surrender the boat unwarrantably, then the defendant would be liable, for it was responsible for the possession of Murphy, and when the specific purpose of that possession was accomplished it must see that the boat was restored to the plaintiff. If it omitted to do so upon demand, conversion would lie; that is, ordinarily the plaintiff would not be obliged to look to Murphy for his boat, who was not employed by him to make the repairs contemplated by the surveyors. In stating that the possession of Murphy was that of the defendant, I have taken the most favorable view of the evidence for the plaintiff, as he is entitled to that on this motion. The defendant's counsel insists that Murphy was in possession by the consent of both parties, and that, when the defendant paid its portion of the expenses, it was absolved from any further liability, and the plaintiff was relegated to his remedy against Murphy. The contract of insurance provides that the insurer may enter into a contract to make the repairs, and this implies that it must pay therefor. The surveyors may determine that there are "defects caused by rottenness" requiring repair, and may include them in the specifications. The plaintiff is liable for the payment of such repairs, but it cannot be that the person who makes them by virtue of a contract with the defendant must obtain his compensation from the plaintiff. The contract is with the defendant, not with the plaintiff. The defendant is primarily chargeable with the payment of all the repairs provided for in the specifications, and it then holds its claim against the plaintiff for whatever is chargeable to him. That was the evident construction given by the defendant to the policy in this case. It made the contract with Murphy without any consultation with the plaintiff, and it did not even carry out that provision in the policy requiring the contract to be

let to the lowest bidder. It assumed that the plaintiff had nothing to do with that matter, but that the question of repairs was exclusively committed to it; that Murphy was in its employ, its agent; and the consequent deduction must be that his possession was its possession. Even if this be too rigorous a construction of the contract of insurance against the defendant, we cannot say, as a matter of law, that Murphy had the custody of the boat by the joint direction of the parties. At best it is a question of fact for the jury. Of course, if Murphy were in possession, either under the joint proprietorship of the parties or under a special agreement with the plaintiff to make repairs for him, this action would not lie, for the defendant could not then be required to exact surrender of the boat by Murphy.

We are, therefore, brought down to the narrow margin, was there evidence sufficient for the jury to say that the extra work performed by Murphy was not authorized by the plaintiff? If so, the detention by Murphy, and consequently by the defendant, was without authority, and this action is proper. If not, then defendant is not liable, for, if plaintiff employed Murphy, of course the defendant cannot be made the whipping post for their troubles. When the boat was brought in for repairs, the plaintiff claimed he was not well, and, desiring to go to New York, by power of attorney he authorized one Homer to act for him "in all matters pertaining to holding survey and repairing damage done to my canal boat George Murr in consequence of sinking in the Erie Canal on or about August 6, 1896, giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully, to all intents and purposes, as I might or could do if personally present." By this instrument the power vested in Homer was limited to the reparation of damages "in consequence" of the accident, and hence, if he made any agreement with Murphy for extra work, he transgressed his special authority. Again, the rottenness of the boat was not "in consequence" of the accident. That was an intrinsic defect. To be sure, if the surveyors saw fit to require such defects to be repaired, the plaintiff could be charged therefor, and Homer, within the scope of his agency, could have provided for them. The surveyors did not require them to be made, and the defendant did not let the contract to the highest bidder. It assumed exclusive control, and turned the boat over to Murphy, its surveyor, to make the repairs, and without consultation with or notice to the plaintiff. The supplemental agreement of the parties, preliminary to the selection of appraisers to ascertain the "actual damage sustained by the vessel in the late disaster by sinking near Lockport, N. Y.," did not alter the policy. That was simply to make effective the adjustment and reparation of damages to the boat. It emphasizes the contention, however, that Murr did not intend to make the repairs due to decay, for no provision is made therefor. Murr probably was seeking to avoid that expense, and this additional agreement, therefore, omits any reference to inherent defects. This construction is confirmed by the conduct of the defendant in assuming exclusive control and possession of the boat. The power of attorney

to Homer was executed after this supplemental agreement, but before the report of the appraisers. One selected had not acted, and among the duties committed to Homer was the choosing of another to act, and other questions might arise within the letter of his special authority. The restriction in the power of attorney is important, because Murphy claimed the employment was made by Homer for the plaintiff. The case was tried once before, resulting in a verdict for the plaintiff, which was reversed by this court. 24 App. Div. 390, 48 N. Y. Supp. 757. On the former trial the defendant relied upon verbal declarations of Homer, either independent of the written power of attorney or in interpretation of its meaning; and Homer, testifying for the plaintiff, stated that the plaintiff told him "to take care of the boat, and do the best I could." In the opinion of this court considerable stress was laid upon this declaration as supplementing the power of attorney, and that Murphy, therefore, under the employment of Homer, had a valid lien, which plaintiff must pay before he was entitled to the return of his boat. Homer was not sworn as a witness for the plaintiff on the second trial, but was put on the stand by the defendant, though evidently in sympathy with the plaintiff, and he sought to mollify or explain this testimony to meet the exigency caused by the comments in the opinion referred to. He testified that Mayer, the agent of the defendant, spoke to him about the necessity of putting in the boat "some new floor timbers, a new keelson, and a new bilge keelson," and he replied that he "would write to Murr about that"; that this was on Friday morning,—the day the surveyors were estimating the repairs required,—and that he at once advised the plaintiff by letter what Mayer had told him; that Murr came on to Buffalo on Tuesday, and told him he should not want any of the exra work done. Murr confirmed this statement, and added that he told Mayer on this Tuesday that he would only pay the $100. If this testimony is correct, then there was no authority for Murphy to make the extra repairs. Again, Homer testified, contrary to his evidence on the former trial, that plaintiff did not tell him "to take care of the boat, and do the best I could"; that what he meant by saying that he was directed "to see that the work was properly done referred to the work to be performed by the defendant in pursuance of the survey." He also testified he never gave any authority whatever, either to Mayer or Murphy, to make any repairs on the boat not called for in the survey. Mayer testified that Homer made the arrangement to put in the new floor timbers and the new keelson, and the price was agreed upon between them. This is substantiated by Lyons, Cole, and Murphy. Cole was the surveyor selected by Homer to represent the plaintiff, and testified that he suggested the propriety of having these repairs made, which were not due to the accident, but advisable for the preservation of the boat, and that they could be made more cheaply and advantageously in connection with the other repairs than later on; that Homer fell in with this suggestion; and the witness testified that he was present, and heard the arrangement made between the plaintiff and Murphy substantially as testified to by the latter. We have, there-

fore, four witnesses, two, at least, of whom are disinterested, giving a version as to the nub of the controversy in diametric opposition to the story related by the plaintiff and Homer.

It is urged with much cogency that the collateral circumstances are in strong confirmation of the defendant's witnesses; that it is conceded these extra repairs were essential; that the defendant certainly gave no warrant for them; that they were in fact rendered by Murphy, and there is no intimation that his charges are exorbitant, or that the work was improperly done. The rule, however, has been very pointedly laid down by the court of appeals that the credibility of witnesses must be first passed upon by the jury. Williams v. Railroad Co., 155 N. Y. 158, 49 N. E. 672. That case is quite analogous to the present one. The plaintiff, while riding on the top of a box car, was struck by a bridge over the track, and sustained injuries. He testified on the first trial that he had been riding on this train for over three weeks, passing daily under this bridge, and often on a box car. The court of appeals reversed a recovery on the ground that he knew or should have known that the bridge was too low for him to pass under while on the box car, and that he was, therefore, within the principle of assumed risks. On the next trial, the plaintiff, knowing the precise point upon which his former judgment was overturned, testified that he had never passed under this bridge on a box car, and "that he did not know it was a low bridge." The plaintiff was nonsuited, presumably on the ground that he had changed his testimony to meet the emergency. The court of appeals reversed the judgment of nonsuit on the ground that the credibility of the witness was for the jury, adding: "On one of the trials it is quite likely that the plaintiff's testimony was truthfully given, but whether on the first or the second trial was for the jury, not the court, to determine." If the jury decided against the clear preponderance of the testimony, the court can rectify the error by granting a new trial. Rollins v. Railroad Co., 44 App. Div. 474, 60 N. Y. Supp. 897. The credibility of Homer was vouchsafed by the defendant, as he was its witness. It should not stand sponsor for him, and then assert he was utterly without belief because he did not happen to meet its expectations. Whatever, therefore, may be our views of the weight of the testimony in this case, under the authorities it was for the jury to say whether Homer possessed the authority to bind the plaintiff for these extra repairs; and, secondly, if, possessing that authority, he did in fact make the agreement with Murphy. The power of attorney does not, in terms, give this authority, so it must depend upon the verbal direction ancillary to the written warrant. On the preceding trial Homer testified to this verbal permission in enlargement of the power of attorney, and that was the point upon which the reversal was based. Upon this trial, while Homer was a witness for the defendant, and under the examination in chief of its counsel, he denied there was any such direction. That covered the precise point upon which the new trial was ordered, and thus the case now comes up with a question of fact in it, and clearly distinguishable from its aspect on the prior appeal. The tender of the $100 was a question of fact, and so determined by this court when the case was disposed

of before. In any event, Murphy declined to surrender the boat unless his entire bill was paid, and there was no necessity of an actual offering of the money to him when he foreclosed its object by saying, in effect, it would not be accepted in extinguishment of the lien under which he was holding the boat. The plaintiff was ready to pay the $100 either to the defendant or to Murphy, and offered to do so; but the one declined to receive it on the ground that Murphy was the custodian of the plaintiff's boat, and the other that the tender was insufficient.

The plaintiff's exceptions sustained, and a new trial ordered, with costs of this motion to plaintiff to abide the event. All concur, except McLENNAN, J., who dissents.

McLENNAN, J. (dissenting). I cannot concur in the conclusions reached by a majority of the court in this case. The defendant insured the plaintiff's canal boat George Murr against loss or damage. The policy, among other things, provides:

"In case of loss or misfortune, * * * two competent surveyors shall be appointed, one chosen by the insurer and one by the insured, or their agents (and in case of disagreement between them they shall appoint an umpire), whose duty it shall be to make specifications in writing under oath, clearly stating both the amount of work and the manner in which it shall be done to make said vessel good for any damage caused by the disaster; but if shown on survey that repairs cannot be made to make the vessel good for any damages caused by the disaster without making good defects caused by rottenness, then the said surveyors are to state the nature and amount of work that shall be done to make good such defects, the assured being liable for the whole expense of same. From the surveyors' specifications estimates shall be obtained from responsible boat builders or shipwrights, giving the cost of repairs called for by survey, and the insurers may contract with the party making the lowest estimates to make said repairs; to the expenditures and amount whereof the said assurance company will contribute according to the proportion the sum insured bears to the valuation aforesaid, and the surplus, if any, paid or advanced by said insurers, shall be a lien upon and shall be recoverable against the boat, or any part thereof, or against the insured, at the option of the insurers. * * * No partial loss or particular average shall in any case be paid by the insurers, unless it exceeds $100.00. * * * And in all cases of either general, particular average or total loss, one hundred dollars shall be deducted therefrom."

In the month of August, 1896, an accident occurred to the boat, and she was damaged to a considerable extent. On the 15th day of August, 1896, the plaintiff and defendant entered into an agreement in writing to "hold survey" on the boat, which, among other things, provided:

"And I, Charles Murr, on the part of the owner, do hereby call and cause a special survey to be made of the condition of the above-named vessel by such, men, experts, as we may hereafter fix upon, for the purpose of ascertaining and fixing upon the actual damages sustained by the said vessel in the late disaster by sinking near Lockport, N. Y. [Signatures of parties.] The specifications in the survey to be considered conclusive, but the estimated expense of making the repairs to be considered merely approximative."

The plaintiff, after executing the above agreement, being unable to give his personal attention to the business, on August 19, 1896, by an instrument in writing under seal, duly appointed and constitut-

ed one Adam Homer his true and lawful attorney, in the words following:

"* * * Do make, constitute, and appoint Adam Homer my true and lawful attorney, for me and in my name, place, and stead to act for me in all matters pertaining to holding survey and repairing damage done to my canal boat George Murr in consequence of sinking in the Erie Canal on or about August 6, 1896, giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite to be done in and about the premises as fully, to all intents and purposes, as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that my said attorney or his substitute shall do or cause to be done by virtue thereof."

Thereafter, pursuant to the terms of the policy and of the agreement made August 15, 1896, the defendant, by its duly-authorized agent, selected one surveyor, a Mr. William Murphy, Jr., and the plaintiff by his attorney, Adam Homer, selected another surveyor, a Mr. Horace E. Cole, to make the survey provided for in the policy of insurance and by said agreement. The surveyors so appointed examined the boat, and on the 20th day of August, 1896, made and signed their survey, specifying in detail the damage done to the boat by the disaster, and specifying in detail the work necessary to be done "to restore the said vessel to as good condition and order as she was immediately previous to the above mentioned disaster." The canal boat was on the dry dock of William Murphy, Jr., the surveyor selected by the defendant, to be repaired, when the surveyors examined her and made the survey. The boat was put on Murphy's dry dock with the knowledge of and by the express personal direction of the plaintiff. Homer testifies that, when the plaintiff delivered the power of attorney to him, "he [the plaintiff] told me to take care of the boat, and get her off Riley's dock. He told me to take care of the boat, and get her off the dock [Riley's], and get her over on Murphy's dock." The boat was first put on Riley's dock, but some difficulty arose, and the defendant's agent did not want Riley to make the repairs. Homer, when called as a witness by the plaintiff, gives this version of what then occurred:

"I asked Mayer [the defendant's agent] why he wouldn't let the boat be fixed on Riley's dock, and he said he wouldn't allow Riley to fix the boat. * * * Then I had Riley launch the boat after he got his pay, and he launched the boat at two o'clock in the afternoon on Thursday. It was hard for Riley to let her go, because he wanted the job very bad. I told him it didn't make any difference, and, after he had his pay, to launch the boat."

The boat was then taken to Murphy's dock by the defendant, where it was repaired. The foregoing evidence is nowhere contradicted. After the boat was put on Murphy's dock, and the survey was completed by Murphy and Cole, in which was specified all the work which was necessary to repair the damage caused by the disaster, and all the repairs for which the defendant was to pay, Murphy commenced repairing the boat. He made the repairs specified in the survey, and he made other repairs not called for by the survey, but which were necessary in order to make the boat seaworthy on account of the rottenness of her timbers and other defects, to the amount of $319.72. Concededly, the repairs were necessary to make plaintiff's boat sea-

worthy, or, at least, such repairs were proper. Plaintiff's agent saw the extra repairs being made from day to day, and by Murphy, and concededly did not object, although he knew exactly the extent of the repairs the defendant was obligated to make, and the exact extent of its liability. Murphy and three other witnesses testified that the plaintiff's agent (Homer) ordered the extra or additional work done. Homer testified that he did not order it done; that he only "demanded it." He says:

"I did not order Murphy to put in this bilge keelson [a part of the extra work] before Murr came here in response to my letter, but I demanded it. I demanded he put it in, and told him the reason why. I told him why I demanded it. I told Murphy that the boat without the bilge keelson, the way she had been strained and racked, that it would be necessary, to make her seaworthy, to put the bilge keelson in her, in order to hold her deck so that she wouldn't spread any more."

When the work was completed by Murphy,—both the work specified in the survey and the extra work,—the defendant paid for all the work which was specified in the survey, and which, by the express terms of the contract, it was liable for. The plaintiff refused to pay for the extra work done, on the ground that neither he nor his agent ordered or authorized it, and on the ground that, even if Homer, his agent, did authorize it, such authorization was without authority, and was not binding upon him, the plaintiff; that the power of attorney was not broad enough to cover such an act on the part of Homer. Murphy refused to surrender possession of the boat to either plaintiff or defendant until he received pay for the entire work, including the extra work done by him. Both parties refused to pay for the extra work, and this action was commenced to recover from the defendant $1,700, the alleged value of the boat, the plaintiff claiming that the defendant wrongfully neglected and refused to deliver to him the possession of the boat. Upon the whole evidence the learned trial justice directed the jury to find a verdict in favor of the defendant of no cause of action.

We think the direction was fully justified upon any one of at least four grounds: First. Upon the ground that plaintiff's agent, Homer, having full authority so to do, expressly authorized the extra work to be done by Murphy for and on behalf of the plaintiff. Second. That, even if the plaintiff's agent, Homer, did not expressly authorize the extra work, he knew that it was being done for the benefit of his principal, and that it was necessary to the proper performance of the work Murphy was directed to do under the survey, but was not included therein, and knew that the defendant was in no manner liable therefor; and, having full authority in the premises under his power of attorney, and not having objected to the performance of the work by Murphy, the character of which was fully known to him, the plaintiff is estopped from denying that such work was done by his direction. Third. The canal boat having been put in Murphy's possession with the knowledge and consent of the plaintiff's agent, and upon the express direction to him (by the plaintiff) for the purpose of having the specified work done for which the defendant was liable, and for which it agreed to pay, when the defendant pro-

cured such work to be completed, and paid for the same, it discharged its full duty, and was not responsible for the action of Murphy in retaining possession of such boat by reason of a demand which he claimed to have against the plaintiff for extra work, and in respect to which the defendant in no manner interfered. Fourth. Upon the ground that, under the circumstances disclosed by the evidence in this case, the demand made by the plaintiff upon the defendant for the possession of the boat was not sufficient to enable him to maintain an action of conversion.

As to the first proposition, the power of attorney authorized Homer "to act for me [the plaintiff] in all matters relating to holding a survey and repairing damage to my canal boat George Murr in consequence of sinking in the Erie Canal." It is suggested by plaintiff's counsel, and the suggestion was adopted in the prevailing opinion, that the authority of the agent is restricted to acts "relating to the repair of parts of the boat actually specified in the survey"; in effect, that if the surveyors only discovered and specified in the survey that the "tiller blade" was broken, and did not discover or specify that the "tiller helm" was broken, under the power of attorney plaintiff's agent was authorized to superintend the putting in of a new blade, but had no authority to direct that a new handle should be put on, the only means by which the new blade could be operated. We think the more reasonable interpretation of the power of attorney is that under it the agent, Homer, had authority not only to superintend the doing of the work actually specified in the survey, and the repairs to the parts actually broken by the accident, but also to direct such additional work incidental thereto which was reasonable or necessary to make the work specified in the survey useful, and to make the vessel seaworthy. The agent was present, and acted for the principal in all matters relating "to repairing damage to my canal boat George Murr in consequence of sinking in the Erie Canal." Having such authority, which we regard as ample, four witnesses—Cole and Murphy, the surveyors, Mayer, the defendant's agent, and a man by the name of Lyon, a boat builder, who was wholly disinterested—testified positively that Homer directed Murphy to do the extra work. Homer, as we have seen, denies that he "ordered" it, but says he "demanded" it. We think, under the circumstances, there is no difference in the meaning of the two expressions. It cannot be claimed that "demand" related to work to be done by the defendant, or which it ought to have done, because, before the conversation which Homer admits took place, the work to be done by the defendant had been definitely settled by the survey, to Homer's knowledge. What right had Homer to demand that Murphy do the work in question, unless he expected to pay for it? He knew the defendant was not liable for such work, and he knew that by the terms of the agreement for the survey, which was signed by the plaintiff personally, no provision was made for doing extra work as between the plaintiff and defendant. We are of the opinion that under the circumstances Murphy was justified in doing the extra work pursuant to the "demand" made by the plaintiff's agent, precisely as if he had given an "order" or "direction" for the doing of such work. We

think the distinction which was apparently sought to be made by the witness Homer in giving his testimony is a mere quibble, and should not receive the serious consideration of the court. Eliminating such attempted distinction, the evidence is uncontradicted that the plaintiff's agent authorized the work to be done which was the basis of Murphy's lien, and under which he held the boat, and refused to deliver possession thereof. While certain statements or conclusions may be found in the evidence given by Homer to the effect that he did not "order" the work, did not "direct" the work, did not "authorize" it, as a summing up of the whole matter he testified that he "demanded" that the repairs be made. Even if the distinction between "demand" and "order," as applied to this case, was broader than we conceive it to be, it seems to us that it should not be held, under the circumstances, sufficient to give effect to a palpable trick, and enable the plaintiff to receive the benefit of important and necessary repairs made to his boat, without paying for the same.

The plaintiff can base no claim upon the fact that the survey did not specify the work necessary to be done on account of the condition of the boat, and which was not made necessary by the disaster, as provided by the terms of the policy, because by the agreement executed by the defendant and the plaintiff personally it was expressly agreed that the surveyors should be selected only "for the purpose of ascertaining and fixing upon the actual damages sustained by the said vessel." Plaintiff's agent was, therefore, not in a position to claim that he understood the extra work was to be done under the policy or under the survey, and it was entirely immaterial to the plaintiff whether the work called for by the survey was done by the lowest bidder or not, because by the agreement it was limited, as between the parties, to the work which the defendant alone was obliged to pay for. Upon the uncontradicted evidence there was an implied promise on the part of the plaintiff to pay for the extra work done by Murphy. The silence of either party will import assent to the terms of a contract whenever it would have been incumbent on him to express his dissent if he did not agree thereto. Anson, Cont. 16; 1 Story, Cont. § 491. As was said by Beach in his work on Contracts (volume 1, p. 778):

"Whether the silence of a person, with the knowledge that another was doing valuable work for his benefit, and with the expectation of payment, indicates that consent which would give rise to the inference of a contract, must be determined by the circumstances of each case."

In the case of City of Buffalo v. Yattan, Sheld. 483, it was held that, where a canal boat was sunk in the harbor of Buffalo, and abandoned by the owner, and afterwards raised by the city, at its expense, the city had a valid lien upon the boat for the amount of expenses incurred in raising it. The court said:

"The very act of reclaiming the property which he once abandoned, * * * and receiving it in its improved and more valuable condition, would be an implied recognition of the plaintiff's right to indemnity."

The rule is thus stated in Jones, Liens, § 734:

"If the property is improved and enhanced in value by the workman's labor, the authority by the owner to have it done on the footing of a workman's lien

may be implied from the relation of the parties, or from the circumstances of the case."

Monaghan v. Woolsey (Sup.) 6 N. Y. Supp. 157; Storrs v. Congregational Church, 17 Wkly. Dig. 179.

The Storrs Case, supra, was decided by the late general term of the Third department, and in that case the court said:

"The church has the benefit of the work done and the materials furnished. It is evident it was done by virtue of an understanding. No objection was made to its being done. Plaintiff did the work with the full knowledge of the congregation, and it has been accepted. The church has had the benefit of plaintiff's services. It knew, through its officers and members, that such services were being rendered, and this implies a contract to pay."

Mackey v. Webb (Sup.) 6 N. Y. Supp. 795.

In the case of Moore v. Moore, 21 How. Prac. 211, the rule is stated to be:

"Ordinarily, from the fact of rendition and acceptance of services beneficent in their nature, the law will imply a promise to pay what the services are reasonably worth."

This rule was quoted with approval in Re Stevenson, 86 Hun, 325, 33 N. Y. Supp. 493; Kleb v. Wallach, 6 App. Div. 583, 39 N. Y. Supp. 654.

Assuming that we have correctly interpreted the meaning and scope of the power of attorney from the plaintiff to Homer, the plaintiff is in the attitude of standing by, seeing valuable and necessary repairs made upon his canal boat by Murphy, knowing that it was expected by Murphy that he (the plaintiff) would pay for the same, and knowing, also, that no one else was liable therefor, and, after the repairs are completed, he claims the right to the possession of the boat in its improved condition, without paying for the work done, on the ground that it was not authorized. Under such circumstances, we think the authorities amply justify the conclusion that the plaintiff's silence was an authorization, and that a promise to pay will be implied.

The defendant's possession of the canal boat was not of such a character as to authorize the plaintiff to maintain an action of trover because of its failure to discharge the lien which Murphy had upon the boat, and under which he claimed to retain it, which claim concededly the defendant in no manner created or was responsible for. After the completion by Murphy of the work called for by the survey, and payment therefor by the defendant, and it had offered to surrender all its right of possession to the plaintiff, it discharged its full duty, and was under no obligation to adjust or settle Murphy's claim. As we have seen, possession of the vessel was given to Murphy by the joint action of both parties, and by the express direction (through his agent) of the plaintiff, for a specific purpose, to wit, to enable the defendant to procure the repairs to be made specified in the survey, and which it was obligated to make by the terms of the policy. The defendant was only entitled to, and in fact only had, possession for such limited purpose. The plaintiff would have been entitled to permit the crew to live in the boat while the repairs were being made, if he so desired, if it would not interfere with the work

to be done.   The plaintiff was entitled to the entire possession, and
to exercise exclusive acts of ownership, except in so far as it was
necessary to surrender the same to enable the defendant to perform
its agreement to repair.   If the plaintiff did not authorize Murphy
to make the extra repairs, he was not entitled to retain the prop-
erty, and the plaintiff could have recovered its possession from him.
In the case of Dickinson v. Dudley, 17 Hun, 569, one Page, plaintiff's
assignor, delivered certain stock to the defendant in that case, and
authorized him to borrow thereon the sum of $3,000.   The defend-
ant borrowed $3,000 on the stock, and agreed at the same time that
the lender should also hold it to secure the payment of $600 due to
himself, and the defendant was, therefore, unable to obtain and de-
liver the stock to the plaintiff when demanded.   It was held that
those acts did not amount to conversion, and that an action of
trover would not lie.   In writing the opinion of the court, Judge
Daniel says, at page 572:

"In this case, however, it is to be observed that no charge was imposed upon
this property by the conduct and act of the agent beyond that authorized by
the principal.   As to the agreement that the lender should hold the property
as a further security for the sum owed by the agent to him, as nothing was
advanced under the agreement, it imposed no charge upon the property.   Not-
withstanding the existence of such a stipulation made on the part of the de-
fendant, the lender had no right to hold the property for anything beyond the
sum of $3,000, which the defendant was authorized to borrow for the use of the
owner upon it."

In the case at bar in no view can the transaction between the de-
fendant and Murphy be held to have authorized Murphy to make
the repairs for which he claimed to hold the boat, and, if the trans-
action between the plaintiff and Murphy was of like character, then
the plaintiff was entitled to obtain possession of his boat at once
from Murphy, notwithstanding his claim.   If A. delivers personal
property to B. for the purpose of enabling B. to make specific re-
pairs upon it which he is obligated to make, and B. delivers the
property to C., with the knowledge and consent of A., for the sole
purpose of having C. make such repairs, and C., under an arrange-
ment which he claims to have made with A., makes other and addi-
tional repairs upon the property, and refuses to surrender posses-
sion of the property to B. until A. satisfies such claim, which con-
cededly B. in no manner authorized, we think it would be unrea-
sonable to hold that A. could maintain an action of trover against
B., and thus compel B. to litigate and settle the dispute or contro-
versy between A. and C.   We think the more reasonable rule is that,
B. having procured the repairs, for which he was liable, to be made
by a person selected by both parties, his full obligation was dis-
charged when such repairs were completed and paid for.

The demand in this case was not sufficient.   It was in writing,
and is as follows:

"Buffalo, N. Y., September 10th, 1896.

"Messrs. Smith, Davis & Co.—Gentlemen: You insured the canal boat
George Murr in the Western Assurance Company of the City of Toronto, by
canal hull policy No. 7,046, for $1,700, from July 19th, 1896, to July 19th, 1897.
Early in August the boat sank near Pendleton guard lock.   As insurer, you
took possession of the boat, to make the necessary repairs, and it was re-

paired by you through William Murphy, of this city, and is now in condition for me to take and use it. Under the policy of insurance my average was $100. I herewith tender you the $100 in payment of such average, and demand possession of my boat, and, if possession is retained after to-day, I shall require you to make good to me the value of the use of that boat as long as you keep it from my possession."

We think such demand was not an unqualified demand. Under it the defendant was informed that, if it did not surrender the possession of the boat, the plaintiff would seek to hold it responsible for the use of the boat, as long as it kept it in its possession. That, and that alone, was the penalty which the defendant was informed would be exacted in case it neglected or refused to deliver possession of the boat. A demand must be unqualified, in order to make it the foundation of an action in trover. 2 Jag. Torts, p. 727; Monnot v. Ibert, 33 Barb. 24.

The conclusion is reached that the plaintiff's exceptions should be overruled, the motion for a new trial denied, and judgment directed for the defendant of no cause of action.