Thomson, P. J.
In about 1891 two brothers named Pickett discovered a deposit of sulphur in Mineral county, on land which they supposed belonged to the United *440 States and open to occupation and purchase, and on which they made two placer locations, called the Vesuvius No. 1 and the Vesuvius No. 2. In 1900 T. S. Todd secured an option from the Picketts on these claims, under which he took possession of them. In April, 1901, Todd assigned his option to The American Sulphur and Mining Company, a corporation with headquarters in New York, and turned his possession over to it. Shortly afterwards the company took up the option and received a deed to the claims from the Picketts. The grantors of the company had laid out a large sum of money in workings and improvements on the property, consisting of shafts, tunnels, open cuts and drifts, and the company continued the work after it took possession, expending some thousands of dollars in the development of the property.
In 1894, Dennis Brennan, while prospecting in the vicinity of the Vesuvius claims, discovered some deposits of sulphur. He did not locate upon them, or take any steps to secure title to them, but abandoned them. In July, 1901, he consulted an attorney in relation to his discovery of 1894. This attorney had transacted some business for the sulphur and mining company after it had taken possession of the Vesuvius claims. Brennan was advised by this attorney of the latter’s connection with the company. He had discovered that its claims were probably on a school section, the title to which was in the state of Colorado, and not in the United States, so that title must come’ from the state, and not from the general government. Brennan then associated W. O. Statton with him, and employed the attorney to assist them in procuring leases on the land from the state board of land commissioners. Application was accordingly made to the board by Brennan and Statton for leases on the east half of Section 16, Township 39, N. R. 2 *441 W. N. M. P. M., within which half-section the Vesuvius claims were located. • This section 16 was a school section. On the application of Brennan and Station, and on their statements and representations in its support, leases were granted to them, in accordance with their application, for the term of eight years, and were executed accordingly. The date of the leases was September 6, 1901. About the 13th day of September, 1901, the company for the first time learned that its Vesuvius claims were situated within this school section, and that, therefore, no title to them could be obtained from the United States. On the 14th day of November, 1901, the company presented its petition to the board of land commissioners for the cancellation of Brennan and Station’s leases on the ground of fraud in their procurement, and after investigation of the charge, the board ordered the leases cancelled. Shortly afterwards the same land was leased by the board to the company.
This action was brought by Brennan and Stat-ton against The American Sulphur & Mining Company to divest it of its possession. The complaint set forth the fact of the occupancy of the land by the company and its operations upon the land, and the leases granted to the plaintiffs, and prayed a perpetual injunction, restraining the company from entering into or upon any part of the half-section leased to them, for any purpose whatever. The defendant answered, and also interposed a cross-complaint. In those pleadings it set forth ¡the facts connected with its occupancy of the land, and alleged fraud and deceit in the procurement of the leases by the plaintiffs, and also alleged the cancellation of the leases by the state board. The plaintiffs replied to the answer, and answered the cross-complaint. Among other things, the cross-complaint alleged that the plaintiffs, by themselves and through their attorney, *442 in support of their application for the leases, stated that they did not know whether or not any persons other than themselves had done development work to the amount of $50, consisting of a shaft, open cut, adit or tunnel, on any of the lots applied for, or whether any person other than themselves, at the time of the application, or within ten days, had been engaged in such work; that the premises had nc known value for mining purposes; that no development had been done upon them by any one; and that the leases were desired for the purpose of prospecting. In their answer to the cross-complaint, the plaintiffs ádmitted that, at the time of their application, they knew or had reason to believe that the defendant company was engaged in operating the Vesuvius Nos. 1 and 2 placers, and had on certain parts of them expended a large sum of money in their development and improvement; and that they made to the board the representations with which the cross-complaint charged them; but they denied that they knew the representations to be false. They alleged that while they were cognizant of the fact and nature of the company’s operations on the Vesuvius claims, they did not know that those claims were located on the ground covered by their leases.
By section 9 of article IX of the constitution, the governor, superintendent of public instruction, secretary of state and attorney general, constitute the state.board of land commissioners, with power of direction, control and disposition of the public lands of the state under such regulations as may be prescribed by law. Section 3634 of Mills’ Annotated Statutes authorizes the leasing of those lands by the board, and defines the terms of lease generally, making, however, separate provision as to lands in which mineral may be found. Section 3637 provides as follows: “Should any one apply to lease any.of the *443 lands belonging to the state upon which, there are improvements belonging to another party, before the lease shall issue, he shall file in the office of the state board of land commissioners a receipt showing that the price of said improvements, as agreed upon by the parties, or fixed by the state board, has been paid to the owner thereof in full, or shall make satisfactory proof that he has tendered to such owner the price of said improvements, so agreed upon, or fixed by the board.” This provision makes it the duty of an applicant for a lease to exercise at least some diligence to discover whether another party is upon the land, and if so, what has been done by him in pursuance of his occupancy; and if improvements have been made by him, the payment or tender to him of the price of the improvements, is made a condition precedent to the granting of the lease. In order that the board may act intelligently, it is necessary that it inquire into the facts relating to such occupancy, so that if there are improvements it may fix the price if the owner refuses to do so. It was in answer to questions framed to elicit information upon this subject, that the statements of want of knowledge were made. Now the testimony of the plaintiffs and their witnesses, warrants a strong inference that they actually knew that the claims the plaintiffs were engaged in developing were located on this identical half-section of land. When the scheme for obtaining the leases was evolved, they seem to have been entirely aware that its success would bring them into collision with the company; the attorney whom they employed declined to act for them until he had severed his relations with the company as its attorney; they proceeded to the accomplishment of their purposes cautiously and mysteriously, keeping their movements under cover to avoid publicity. Their conduct throughout is inexplicable except on the sup *444 position of a proposed invasion of the defendants’ possession.
■ However, it was possible that they did not know to a certainty the exact location of the defendants’ workings with reference to the boundaries of the land they proposed to lease. But it is clear that they were sufficiently acquainted with the situation to know that the leases they sought would probably include those workings. They knew enough to put them upon inquiry. An ascertainment of the facts would not have, been difficult, and a compliance with the statutory provision concerning payment for the improvements of another, as well as good faith, demanded that- the inquiry be made. Under the circumstances disclosed by the evidence, their avoidance of the means of information at hand, stamped their declarations with the brand of fraud; and the knowledge which they ought to have had, will be imputed to them. We think the action of the board in cancelling the leases should be upheld, if the statutory provision under which they proceeded is valid.
Section 3637 of Mills’ Annotated Statutes provides as follows:
“If through any fraud, deceit or misrepresentation, any party or parties shall procure the issuing of any lease for state lands, the board shall have the authority to cancel any such lease. ’ ’
This is the provision referred to. For the plaintiffs, it is contended that this provision confers judicial power upon the board, and is therefore repugnant to section 1 of article 6 of the constitution, which provides that the judicial power of the state shall be vested in a supreme court, district courts, county courts, justices of the peace, and such other courts as may be provided by law. Counsel say:
‘ ‘ In the present case the action of the land board was judicial in essence and in character. It was a *445 judicial proceeding. Assuming to act under the section in question, the hoard caused witnesses to appear before it at a time and place mentioned; caused them to be sworn and to testify; and, as a result of what was to all intents and purposes a trial of a case in a court, made findings of fact and conclusions of law to the effect that the leases of the plaintiffs in this case had been procured by fraud, deceit and misrepresentation ; and thereupon cancelled such leases and granted leases to the opposite side. If this was not a judicial proceeding in essence and in character, as well as in effect, it is difficult to understand what such terms mean. ’ ’
The board is not by law constituted a court, and cannot exercise the functions of a court. But is the authority to cancel a lease for fraud, deceit and misrepresentation, judicial in its character within the meaning of the constitution? There is no provision as to the manner in which the board shall proceed. It is immaterial in what way the facts are brought to its knowledge. No notice to the lessees is required, and the board may act ex parte. It is when it discovers, no matter how, that it has been induced by deceit, fráud or misrepresentation to execute a lease of the state lands, that it may cancel the contract. The fact that in this ease the board was moved by a petition from the defendant, that witnesses were sworn and examined, and that it was upon the evidence thus obtained that the action was taken, does not affect the question. The board had no authority to cancel the leases unless they were fraudulently procured. It was incumbent upon it to satisfy itself in some way that it had been deceived; and how the manner in which it reached the result can impress a judicial character upon its proceeding, we confess ourselves unable to see. It was a party to the contracts, and could not resolve itself into a court to try *446 its own case. All it was authorized to do was, from facts which • came into its possession, to determine whether it should be bound by those contracts. The statute confers upon it an authority analogous to the right possessed by an individual to rescind his contract when he discovers that it had been fraudulently procured. Relative to this right, it is said in 24 Am. and Eng. Enc. Law (2d ed.), 643, that “where a contract is procured by fraud, misrepresentation or deceit, the defrauded party is entitled to rescind without invoking the aid of a court of equity; that is, he may disaffirm and repudiate the contract, and thereafter maintain an action at law against the party guilty of the fraud, or plead the fraud as a defense to an action to enforce the contract or to recover damages for the breach. ’ ’ The mere fact that duties are imposed upon officers which require the exercise of judgment and discretion, does not, of itself, render their proceedings conducted in pursuance of their authority, judicial in the sense in which the term is used in the constitution.
An act of congress passed in 1823, authorized the judges of the superior courts established in St. Augustine and Pensacola to receive and adjust all claims arising within their respective jurisdictions out of injuries suffered by Spanish officers and individual Spanish inhabitants, by the operations of the United States army in Florida, and provided that in all cases where the judges should decide in favor of the claimants, the decisions, with the evidence on which they were founded, should be by the judges reported to the secretary of the treasury, who, on being satisfied that the same were just and equitable, should pay the amount thereof to the person or persons in whose favor the same were adjudged. Florida became a state in 1849, and, by special act, the district judge of the United States was substituted *447 in place of the territorial officer. A claim was presented to the district judge, who took the testimony offered in its support, and decided that the amount asked was due to the claimant. In United States v. Ferreira, 13 Howard 44, the court in a discussion of the capacity in which the judge acted in making the decision, said:
“The powers conferred by these acts of congress upon the judge as well as the secretary, are, it is true, judicial in their nature. For judgment and discretion must be exercised by both of them. But it is nothing more than the power ordinarily given by law to a commissioner appointed to adjust claims to lands or money under a treaty; or special powers to inquire into or decide any other particular class of controversies in which the public or individuals may be concerned. A power of this description may constitutionally be conferred on a secretary as well as on a commissioner. • But is not judicial in either case, in the sense in which judicial power is granted by the constitution to the courts of the United States. ’ \
We do not believe that the objection urged against the statute, or the proceedings under it of the state board of land commissioners, is tenable. We think the law valid and the proceeding by the board authorized. But we do not regard its action as final. It may arbitrarily annul a contract which ought to stand; and the party aggrieved has the right to test the propriety of its action in the proper judicial tribunal. In their complaint, the plaintiffs disregarded the cancellation, and- sought a recovery in virtue of the provisions of their leases. The subsequent pleadings brought the questions of the power of the board to order the cancellation, and the rightfulness of their decision, into the case. The trial court held that the cancellation of the plaintiffs’ *448 leases, and the subsequent leasing of the lands of the defendant, were unauthorized and void, and that the leases to. the plaintiffs were still in effect. As is apparent from what we have said, this opinion of the court is not ours. We think that the cancellation was authorized by law, and that in view of the facts it was properly ordered. Those leases having* been cancelled, the board might lawfully dispose of the land in the same manner as if it had never been leased.
The judgment will be reversed and the cause remanded for further proceedings in conformity with this opinion. - Reversed.