(No. 2423. Sept. 10, 1921.)

## STATE V. KELLY.

(Rehearing Denied Oct. 31, 1921.)

### SYLLABUS BY THE COURT.

[1]   A prosecution for obtaining money by false pretense cannot be predicated upon false testimony given in a suit in court for the recovery of money or property.         P. 417.

[2]   Code 1915, c. 91, which makes the Attorney General, the state auditor, and the state treasurer a "board of loan commissioners of the the state of New Mexico," and invests such board with power to ascertain and determine the debts and liabilities of the territory of New Mexico and the debts of the counties thereof which were valid and subsisting on January 20, 1910, and which were assumed by the state of New Mexico under the Constitution, and providing for the payment or refunding of such indebtedness by the issue and sale of bonds or otherwise by such board, does not confer judicial power upon such board in a constitutional sense, and such board does not constitute a court, and a finding or judgment by such board under such statute is not a judicial judgment or decree.   Such board is an agency created by the state for the purpose of auditing, passing upon, and allowing claims against the state under the statute, and false pretense can be predicated upon a claim presented to such board where the facts warrant.         P. 417.

[3]   A duty to be performed is none the less ministerial because the person who is required to perform it may have to satisfy himself of the existence of the state of facts under which he is given his right or warrant to perform the required duty.         P. 421.

[4]   What might be a judicial proceeding in determining controversies between private individuals is not necessarily such where the interests of the sovereign state are involved. The state can adopt whatever mode or method it elects to determine whether it shall become liable and discharge a given obligation.   It can select whatever agency it sees fit and proper to pass upon the question and provide that upon the determination of such agency the claim shall be paid, and the inquiry conducted by such agency may be administrative or judicial as the Legislature elects.         P. 428.

[5]   The fact that an appeal is provided for from the decision of the board of loan commissioners to the district court does not alter or change the character of the proceedings.         P. 428.

[6]   False pretense may be established by conduct and acts

as well as by words, written or spoken. The presentation of a bogus bond to an agent of the state for redemption is false pretense where the parties so presenting the bond know that it is spurious. P. 430.

[7] Where a duty is intrusted to a board composed of different individuals, such board can act officially only as such in convened session with the members or a quorum thereof present. **Held,** that there was substantial evidence, in addition to the record kept by the board, of the fact that such board, in passing upon the bond in question in this case, did so in a regularly convened session, with the members thereof present. P. 433.

[8] Where a bogus bond is presented to an agent of the state authorized to act in the premises, for payment or refunding, by a letter of transmittal, there is no variance because the letter refers to a territorial bond and the bond in question was a county indebtedness which the state had assumed. P. 435.

[9] The admissions, statements, and declarations of an agent are not admissable to prove agency. There must be prima facie proof of agency before such declarations or statements are admissable for any purpose; but the fact of agency, when it rests in parol, may be established on the trial by the testimony of the agent himself. P. 436.

[10] The existence of an agency may be shown by or inferred from circumstantial evidence. **Held,** that there was sufficient evidence in this case to warrant the jury in finding that the Santa Fe Bank, in presenting the bond to the board of loan commissioners, was acting as the agent of the appellant, under proper authority. P. 437.

[11] The general rule is that the credibility of witnesses is in all cases a question for the jury, and where a witness in the trial of a cause, when first placed upon the witness stand, testifies positively to a given state of facts, and later upon being recalled to the stand for further cross-examination, states that he was mistaken about the facts first testified to, and from certain investigations which he has made after leaving the stand, knows that he could not have had knowledge of the facts so testified to, the weight of both statements is for the jury, and they have a right to decide which statement they will believe, or whether any credence should be given to either statement. P. 441.

[12] The setting of a case for trial by the court will not be reviewed except upon a plain showing of a gross abuse of discretion. P. 447.

[13] Code 1915, § 5901, which provides that the trial court shall set cases for trial not less than 20 days before the first day of the term, is directory. P. 448.

[14] Instructions on reasonable doubt approved. P. 449.

[15]   An appellate court will not search for reasons to reverse a case, and the duty rests upon the appellant to show that error has interevened to his prejudice.        P. 451.

Appeal from District Court, Santa Fé County; Brice, Judge.

William G. Kelly was convicted of obtaining money and property from the State of New Mexico by false pretenses, and from the judgment and sentence, he appeals. Affirmed.

Catron & Catron and A. B. Renehan, both of Santa Fé, for appellant.

Harry S. Bowman, Atty. Gen., for the State.

OPINION OF THE COURT.

ROBERTS, C. J.   The appellant was indicted, tried, and convicted of obtaining money and property from the state of New Mexico by false pretenses.   From the judgment rendered on the verdict sentencing him to the penitentiary, he appeals.

The facts upon which the prosecution was based may be briefly stated as follows:   When Congress passed the Enabling Act, authorizing New Mexico to adopt a Constitution and form a state government, and providing for its admission into the Union, it provided that the state of New Mexico should assume the debts and liabilities of the territory and the debts and liabilities of the various counties of the proposed state.   Pursuant to the Enabling Act the constitutional convention provided for the assumption of such debts by the state.   In 1912 the Legislature, by chapter 16, Laws 1912, created a state loan board and provided a method of procedure by which the debts and liabilities of the state so assumed under the Constitution should be refunded into state bonds.   At this time we will not go fully into said act, as it will later be treated in

detail in the opinion. It is sufficient to say that
provision was made for presenting to the board evi-
dences of indebtedness of the territory and various
counties so assumed, and the issuance by said board
of new bonds, in lieu thereof, or the issuance and
sale of said bonds for the purpose of providing
money to retire the old bonds. The indictment al-
leged that appellant presented to said board for
redemption and refunding a bogus or spurious bond,
No. 254, of the county of Santa Fé, and represented
said bond to be a genuine, valid, and outstanding
obligation of said county. The bond in question was
admitted by the appellant on the trial of the case
in the lower court to be a counterfeit bond, and the
evidence satisfactorily established the fact that it
was counterfeited from Santa Fé county bond No.
187, except as to the number. The indictment fur-
ther alleged that the bond was presented to the
board of loan commissioners by the Santa Fé Bank,
acting as agent for appellant. No objection was
made upon the trial, in fact it was conceded that,
if the Santa Fé Bank was acting as agent, it had
no knowledge of the fraudulent character of the
bond. Appellant did not testify as a witness in the
case. The transcript of the record is very volumin-
ous, and there are several questions which require
consideration.

The first logically which requires discussion is as
to whether the indictment was sufficient to charge
an offense. It is contended by appellant that the
court erred in not sustaining the demurrer to the
indictment, which was based upon the ground that
false pretenses could not be predicated upon repre-
sentations made to the state board of loan commis-
sioners relative to any claim presented to it under the
statute, as such board was a judicial body, with
power to hear the parties, hear proof, investigate
and decide, and that perjury was the only crime

which could be charged under false pretenses or representations made to such board.

The said board of loan commissioners was created by Laws of 1912, c. 16 (chapter 91, Code 1915). Section 1 of the act (section 4545, Code 1915) made the Attorney General, the state treasurer and the auditor the board of loan commissioners of the state of New Mexico, and the board was created—

"for the purpose of ascertaining and determining the debts and liabilities of the territory of New Mexico and the debts of the counties thereof which were valid and subsisting on June 20, 1910, and which are assumed by the state of New Mexico under the Constitution thereof and for the purpose of providing for the payment or refunding thereof by the issue and sale of bonds or otherwise."

Provisions were made in the act for certifying to such board the debts and liabilities of the territory of New Mexico by the state auditor, and a like certification by the boards of county commissioners of each county of the county indebtedness assumed by the state. Section 4551 is as follows:

"All persons, counties and municipalities having any claim or demand against the territory of New Mexico or against any of the counties thereof in respect of debts which were valid and subsisting on June 20, 1910, and so assumed by said state, may submit the same to the said board of loan commissioners and may produce before the said board of loan commissioners the evidences of said indebtedness; and it shall thereupon be the duty of the said board of loan commissioners, after twenty days' notice to the Attorney General of the state of New Mexico, or the board of commissioners of the respective counties as the case may be, to proceed forthwith and without delay, to hear the parties and to take testimony and to investigate, inquire into and determine the validity of the said claims and demands and the liability of the state of New Mexico for the same by reason of its assumption of the debts and liabilities of the said territory and the debts of the counties thereof pursuant to the provisions of the Constitution of the state of New Mexico. Any party aggrieved by the determination of the board of loan commissioners may appeal to the district court and the said board of loan commissioners shall certify to the said district court all testimony, documents and proceedings of the said board with respect to the matter under review and said district court may, if it deems the interests

of justice so require, take additional testimony and shall render its decision or judgment from which decision or judgment an appeal shall lie to the Supreme Court of the state of New Mexico at the instance of any party aggrieved. If no appeal be taken from the decision or determination of said board of loan commissioners or the said district court within twenty days after the same shall have been made, such decision or determination shall be final and binding as to the right to have the said claim or demand paid or refunded under the provisions of this article."

Section 4552 gave the board of loan commissioners power to issue bonds of the state of New Mexico for the payment or refunding of the debt contemplated. The remaining sections provide the form of the bonds, maturity, etc., and the rate of interest.

(1, 2) Appellant is undoubtedly correct in his contention that, if the board of loan commissioners of the state of New Mexico constituted a court, and the presentation of the claim to such board and the proceedings had before such board upon such claim constituted a judicial inquiry and resulted in a judicial judgment or decree, there could be no prosecution for false pretenses made to such board in regard to any claim, and that the remedy would be a prosecution for perjury instead. U. S. ex rel. McManus v. Moore, 3 McArthur (10 D. C.) 226; Hunter v. State, 46 Tex. Cr. R. 498, 81 S. W. 730; commonwealth v. Harkins, 128 Mass. 79. But does it necessarily follow that the board of loan commissioners was a judicial body clothed with the exercise, in this instance, under the statute, with judicial functions? If this be true, grave consequences indeed must follow such a determination, for this board was made up of three executive officers of the state, and if it was invested with judicial powers in a constitutional sense, the act of the Legislature would run counter to article 3 of the state Constitution, which divides the powers of government into three distinct departments, the legislative, executive, and judicial, and provides that no person or collection of persons

charged with the exercise of powers properly belonging to one of these departments shall exercise any powers belonging to either of the others except as in the Constitution otherwise expressly directed or permitted. To give assent to the contention of appellant would, as stated, probably invalidate all the proceedings of this board in passing upon, auditing and allowing claims against the state aggregating millions of dollars. In an early case, Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 15 L. Ed. 372, the Supreme Court of the United States, had before it the consideration of an act of Congress which provided for the issuance of a distress warrant for the amount upon determination by said auditor to be due against such delinquent officials. It was there urged that the duties performed by this auditor were judicial and violated the provisions of the Constitution of the United States which require the judicial power of the United States to be vested in one Supreme Court and such inferior courts as Congress may, from time to time, ordain and establish, and also violated that provision which declared that the judicial power shall extend to controversies to which the United States shall be a party. The court said:

"It must be admitted that, if the auditing of this account, and the ascertainment of its balance, and the issuing of this process, was an exercise of the judicial power of the United States, the proceeding was void; for the officers who performed these acts could exercise no part of that judicial power. They neither constituted a court of the United States, nor were they, or either of them, so connected with any such court as to perform even any of the ministerial duties which arise out of judicial proceedings."

The court said further:

"That the auditing of the accounts of a receiver of public moneys may be, in an enlarged sense, a judicial act, must be admitted. So are all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law. In this sense the act of the President in calling out the militia under the act of 1795, 12 Wheat, 19, or of a commissioner who

makes. a certificate for the extradition of a criminal, under a treaty, is judicial. But it is not sufficient to bring such matters under the judicial power that they involve the exercise of judgment upon law and fact. * * * It is necessary to go further, and show not only that the adjustment of the balance due from accounting officers may be, but from their nature must be, controversies to which the United States is a party, within the meaning of the second section of the third article of the Constitution. We do not doubt the power of Congress to provide by law that such a question shall form the subject-matter of a suit in which the judicial power can be exerted. The act of 1820 makes such a provision for reviewing the decision of the accounting officers of the treasury. But, until review, it is final and binding; and the question is whether its subject-matter is necessarily, and without regard to the consent of Congress, a judicial controversy. And we are of opinion it is not."

After reviewing the argument of counsel in that case, the court said:

"But the argument leaves out of view an essential element in the case, and also assumes something which cannot be admitted. It assumes that the entire subject-matter is or is not in every mode of presentation, a judicial controversy, essentially and its own nature, aside from the will of Congress to permit it to be so; and it leaves out of view the fact that the United States is a party."

And further on it is said:

"Equitable claims to land by the inhabitants of ceded territories form a striking instance of such a class of cases; and as it depends upon the will of Congress whether a remedy in the courts shall be allowed at all, in such cases, they may regulate it and prescribe such rules of determination as they may think just and needful. Thus it has been repeatedly decided in this class of cases that upon their trial the acts of executive officers, done under the authority of Congress, were conclusive, either upon particular facts involved in the inquiry or upon the whole title."

In the case of U. S. v. Ferreira, 13 How. 40, 14 L. Ed. 42, the court had before it a statute of the United States passed to carry into effect a treaty between the United States and Spain, under which this country had undertaken to make satisfaction to Spanish officers and individuals for losses incurred by reason of the operations of the American army in Florida. The law authorized the justices

of the superior courts established at St. Augustine and Pensacola to receive and adjust all claims arising within their respective jurisdictions; and it provided that, where the judges decided in favor of the claimant, the decision with the evidence on which it was founded should be by the judge reported to the Secretary of the Treasury, who, on being satisfied that the same was just and equitable and within the provisions of the treaty, should pay the amount thereof to the person or persons in whose favor the same was adjudged.   The court said:

"Nor can we see any grounds for objection to the power of revision and control given to the Secretary of the Treasury.   When the United States consent to submit the adjustment of claims against them to any tribunal, they have a right to prescribe the conditions on which they will pay. And they had a right therefore to make the approval of the award by the Secretary of the Treasury one of the conditions upon which they would agree to be liable.   No claim, therefore, is due from the United States until it is sanctioned by him; and his decision against the claimant for the whole or part of a claim as allowed by the judge is final and conclusive.   It cannot afterwards be disturbed by an appeal to this or any other court or in any other way, without the authority of an act of Congress."

 And the court further said:

"The powers conferred by these acts of Congress upon the judge as well as the secretary are, it is true, judicial in their nature.   For judgment and discretion must be exercised by both of them.   But it is nothing more than the power ordinarily given by law to a commissioner appointed to adjust claims to lands, or money under a treaty; or special powers to inquire into or decide any other particular class of controversies in which the public or individuals may be concerned.   A power of this description may constitutionally be conferred on a secretary as well as on a commissioner.   But it is not judicial in either case, in the sense in which judicial power is granted by the Constitution to the courts of the United States."

The Secretary of the Treasury in this case, under the act of Congress, reviewed the evidence taken before the judge and determined whether the  claim

should be paid by the United States. This action on the part of the Secretary of the Treasury was as much judicial in its nature as was the action of the board of loan commissioners under our statute. The state prescribed the conditions upon which it would issue the new bonds or pay the old. Its payment or the issuance of the new bonds was made dependent upon the approval of the board of loan commissioners or a judgment of the court on appeal from that body. In the case just referred to the Secretary of the Treasury determined the extent of the damages suffered by the claimant and also as a matter of law whether the claim came within the provisions of the act of Congress. In the case of American Sulphur C. Mining Co. v. Brennan, 20 Colo. App. 439, 79 Pac. 750, the court had before it a statute which gave the state board of land commissioners power to cancel a lease of state lands. The statute provided:

"If, through any fraud, deceit, or misrepresentation, any party or parties shall procure the issuing of any lease for state lands, the board shall have the authority to cancel any such lease."

(3) There the board had authority, under the statute, to investigate and hear evidence, and, if convinced that such lease was procured through fraud, to cancel the same. The court held that the board was not by law constituted a court, and that it could not exercise the functions of a court, and that in the hearing contemplated under the statute the board was not acting in a judicial capacity within the meaning of the Constitution.

In the case of Owners of Land v. People, 113 Ill. 296, the court held that judicial power has never been held to apply to those cases where judgment is exercised as incident to the execution of a ministerial power.

In De Camp v. Archibald, 50 Ohio St. 618, 35 N. E. 1056, 40 Am. St. Rep. 692, the court said:

"The term 'judicial power' as used in the Constitution, is not capable of a precise definition. It is included in the power to hear and determine, but does not exhaust the power. That it embraces the hearing and determination of all suits and actions, whether public of private, there can be no doubt. But we think that it is equally clear that it does not necessarily include the power to hear and determine a matter that is not in the nature of a suit or action between parties. Power to hear and determine matters more or less directly affecting public and private rights is conferred upon and exercised by administrative and executive officers. But this has not been held to affect the validity of statutes by which such powers are conferred. State ex rel. v. Hawkins, 44 Ohio, St. 98-109. The term 'judicial power' has never been taken with such latitude of construction in the usages and customs of our American commonwealth; and to so extend the jurisdiction of the courts would lead to the most embarrassing results with little or no compensation whatever."

As said by the Supreme Court of West Virginia in the case of Wheeling & E. G. R. Co. v. Triadelphia, 58 W. Va. 487, 52 S. E. 499, 4 L. R. A. (N. S.) 321:

"What is a judicial function does not depend solely upon the mental operation by which it is performed or the importance of the act. In solving this question, due regard must be had to the organic law of the state and the division of powers of government. In the discharge of executive and legislative duties, the exercise of discretion and judgment of the highest order is necessary, and matters of the greatest weight and importance are dealt with. It is not enough to make a function judicial that it requires discretion, deliberation, thought, and judgment. It must be the exercise of discretion and judgment within that subdivision of the sovereign power which belongs to the judiciary, or, at least, which does not belong to the legislative or executive department. If the matter in respect to which it is exercised belongs to either of the two last-named departments of government, it is not judicial. As to what is judicial and what is not seems to be better indicated by the nature of a thing than its definition."

In the case of the Post Printing & Publishing Co. v. Shafroth, 53 Colo. 129, 124 Pac. 176, the court had before it for consideration an amendment to the Constitution of that state which provided for the funding of existing indebtedness represented by outstanding state warrants issued without authority of law, and provided for a board which should pass upon and determine the validity of the warrants

with much the same power as that conferred upon the board of loan commissioners. It was there argued that the board exercised judicial functions and powers in violation of a constitutional provision similar to our own. The court said that boards for the auditing and adjustment of public indebtedness in claims against the state were very common instrumentalities in the administration of their finances, and that statutes creating such boards were not invalid; that in creating the board the amendment did not delegate to it powers properly belonging to the judiciary, or encroach upon jurisdiction vested in the courts by any other provision of the Constitution.

In the case of State ex rel. Mills v. McNutt, 87 Wis. 277, 58 N. W. 389, the Legislature had created the town of Knapp from a portion of the town of Millston, and provided that the county board should determine what portion of the indebtedness, if any there be, of said town of Millston should be charged to the new town of Knapp. It was held that the power thus conferred upon the board was not judicial. In the case of In re Sanborn, 148 U. S. 222, 13 Sup .Ct. 577, 37 L. Ed. 429, the question arose as to whether the petitioner had a right to appeal to the Supreme Court of the United States from the disallowance of a claim presented for services rendered certain Indians. The statute authorized the presentation of such a claim to the court of claims, and directed the court to report its findings and conclusions to the Secretary of the Interior. The court said:

"We must find an answer to the question thus put to us by a construction of the Act of March 3, 1887, read in the light of the previous legislation establishing the Court of claims, and regulating the subject of appeals from its judgments to this court.

"This subject came, for the first time, before this court in the case of Gordon v. United States, 2 Wall, 561, wherein it was held that, as the law then stood, no appeal would lie from the Court of Claims to this court. The reasons

for this conclusion are stated in the opinion of Chief Justice Taney, reported in the appendix to 117 U. S. 697, and interesting as his last judicial utterance. Briefly stated, the court held that, as the so-called judgments of the Court of Claims were not obligatory upon Congress or upon the executive department of the government, but were merely opinions which might be acted upon or disregarded by Congress or other departments, and which this court had no power to compel the court below to execute, such judgments could not be deemed an exercise of judicial power, and could not, therefore, be revised by this court.

"A similar question arose in this court as early as 1794, in the case of United States v. Yale Todd, an abstract of which case appears in a note by Chief Justice Taney to the later case of United States v. Ferreira, 13 How, 52, and wherein it was held that an act of Congress conferring powers on the judges of the Circuit Court to pass upon the rights of applicants to be placed upon the pension lists, and to report their findings to the Secretary of War, who had the right to revise such findings, was not an act conferring judicial power, and was, therefore, unconstitutional."

In the case of Ex parte Gist. 26 Ala. 156, the court, after quoting from the case of U. S. v. Ferreira, supra, said:

"So likewise in our own court in the case of Gaines v. Harvin, 19 Ala. 491, 498, a similar provision in our state Constitution came under review; and we there held that it was not the intention of the framers of the Constitution to deny to the Legislature the power to confide to ministerial officers, who do not constitute a part of the judiciary properly so called, many duties involving inquiries in their nature judicial. It was said: 'The practice of this, as of all other governments having their judicial, executive, and legislative departments separate and distinct, very clearly shows that, in the administration of the laws, inquiries partaking of the nature of judicial investigations are confided to persons other than judges, whose acts have never been questioned on constitutional grounds.' "

In the case of State v. Hathaway, 115 Mo. 36, 21 S. W. 1081, the court had under consideration a statute which vested in the state board of health power to examine not only into the literary and technical attainments of the applicants for a cer-

tificate to practice medicine, but also into his moral character.   The court said:

"A judicial duty within the meaning of the Constitution is such a duty as legitimately pertains to an officer in the department designated by the Constitution as judicial. And we can but commend in this connection the language of the same court in Flournoy v. City, 17 Ind. 169, 'An act is none the less ministerial because the person performing it may have to satisfy himself that the state of facts exists under which it is his right and duty to perform the act.' This rule is one quite familiar in this state. It is one that governs sheriffs and constables in making levies and has been applied to the Secretary of the State in determining the sufficiency of a certificate under the election law. State ex rel. v. Lesueur, 103 Mo. 253."

In the case of Lorenzino v. James, 18 N. M. 240, 135 Pac. 1172, it was contended that the board of county commissioners acted judicially in determining whether a liquor license should be canceled. The statute provided for the revocation by the board of county commissioners of a liquor license upon a hearing for specific causes not necessary to set out here. There the liquor license was used outside the locality for which it was granted.   We said:

"It is true the board was required to determine whether the facts existed which required the cancellation of the license; but in so satisfying itself that the state of facts existed, which required the cancellation of the license, it acted only in a ministerial capacity. A duty to be performed is none the less ministerial because the person who is required to perform it may have to satisfy himself of the existence of the state of facts under which he is given his right or warrant to perform the required duty."

In the case of State ex rel. Perea v. County Com'rs, 25 N. M. 338, 182 Pac. 865, this court considered an act of the Legislature which required the state board of loan commissioners to determine the amount of indebtedness owing the counties from which De Baca county was created, and to apportion the indebtedness between the new county and the old ratably in proportion to the taxable property

taken from the old counties. We quote from the syllabus as follows:

"A 'ministerial act' is an act which an officer performs under a given state of facts, in a prescribed manner, in obedience to a mandate of legal authority, without regard to the exercise of his own judgment upon the propriety of the act being done. Held , that chapter 11, Laws of 1917, requiring the board of loan commissioners to determine the amount of indebtedness owing by certain counties, from parts of which a new county was created, and to apportion such debts between the new county and the old counties upon the basis of the assessed valuation which the property taken from the old county bore to the total assessed valuation in such old county, did not confer upon such board judicial powers."

Considering as we must the facts, circumstances, and conditions which led to the creation of the board in question, let us determine whether it was the intention of the Legislature to invest this board with judicial powers. In view of the constitutional provision prohibiting such action, the presumption would be that such was not the legislative intent. Next, it must be borne in mind that the state could not be sued without its consent. Assuming that an individual held an obligation against the state or against a county, the payment of which debt the state had assumed under the Constitution, there was no provision under the Constitution, nor the statute law of the state, by which such an obligation could be enforced. The Legislature knew that millions of dollars worth of bonds were outstanding which, under the terms of the Constitution, the state had assumed and agreed to pay. That these bonds and obligations were valid and binding obligations of the state was also known, and it was the intention of the Legislature to provide for the conversion of the territorial and county debts into direct obligations of the state. It desired to create an agency with power to audit these claims and to refund them. The three officers named created a board for the purpose of auditing and determining the validity of such indebtedness in the

first instance. It provided a method by which the state could be sued upon these obligations; not that the proceeding before the board of loan commissioners in the first instance was a suit against the state, but that the claimant was required, in order to be able to maintain suit against the state upon such an obligation, to first present his claim against the state to this board for audit and approval or disapproval, and, in the event of disapproval, the right of a judicial proceeding and a judicial inquiry on the part of the claimant against the state were given by an appeal to the district court. Where the state elects to give a suitor the right to sue it, it may provide the rights and conditions upon which the suit can be maintained and the mode of procedure to be employed.

Under section 4551, defining the powers and duties of the board of loan commissioners, the board was given power to hear the parties and to take testimony and to investigate, inquire into, and determine the validity of the claims and demands and the liability of the state of New Mexico for the same by reason of its assumption of the debts and liabilities of said territory, and the debts of the counties thereof, pursuant to the provisions of the Constitution of the state of New Mexico. This power was not judicial in the constitutional sense. It was akin to the power that has always rested in the state auditor, or territorial auditor before statehood, to audit all claims against the territory or state, and, if correct to issue a voucher for the same upon the state treasurer. It is like the power given to boards of county commissioners to investigate, determine, and pass upon the claims against the county. The duty of the board in this instance was clearly fixed by law. The discretion was to determine whether the claim was valid or invalid. If it was found to be valid, then the board was required to issue new bonds in lieu thereof, or to pay the

claim in cash.  Take, for example, a claim against a city·on an account, or for damages for personal injuries; the city council may take evidence on the matter and inform itself as to whether it ought to pay the claim, but this act is not judicial.

(4)  Further, no power rests in any one to sue the state.  The adjustment and payment of claims against the state rest entirely with the Legislature and such agencies as it may provide.  It would have been competent for the state to have made the determination of this board final and conclusive as to the liability of the state to pay the old bonds or to issue new ones in lieu thereof.  Of course, a moral duty rests upon the state to take care of its legal obligations, but in the absence of a statute or constitutional provisions there would be no available judicial remedy to enforce them.  What might be a judicial proceeding in determining controversies between private individuals is not necessarily such where the interests of the sovereign state are involved.  The rights and liabilities of a private individual are fixed by law and are to be determined by judicial inquiry or investigation, but not so where the liability of the state is the question involved for determination.  Here the sovereign state can adopt whatever mode or method it elects to determine whether it shall become liable and discharge a given obligation.  It can select whatever agency it sees fit and proper to pass upon the question and provide that, upon the determination of such agency, the claim shall be paid, and the inquiry conducted by such agency may be administrative or judicial, as the Legislature elects.

(5)  The fact that an appeal is provided for from the decision of the board of loan commissioners to the district court does not alter the character of the proceedings.  In the case of U. S. v. Ritchie, 17 How. 524, 15 L. Ed. 236, the Supreme Court of the

United States had before it for consideration an appeal from the decree of the District Court for the Northern District of California involving proceedings taken before certain commissioners appointed to settle private land claims in California under the Act of March 3, 1851, (9 Stat. at L. 631). The commissioners, after hearing proof in the case before them, ordered the title confirmed in the claimants. Thereafter a transcript of the proceedings before the board, with their decision, was filed with the clerk of the United States District Court of the Northern District of California. On a hearing had before the said court, the decision of the board of commissioners was confirmed, and the cause was taken on appeal to the Supreme Court of the United States. On the appeal there taken, a motion was made to dismiss the same by reason of the alleged lack of jurisdiction of the District Court to entertain an appeal from the board of commissioners, for the reason that the said board was not organized as a court, and lacked authority to exercise judicial power, and hence an appeal would not lie from it to the court. Considering this objection, the Supreme Court of the United States said:

"It is also objected that the law prescribing an appeal to the District Court from the decision of the board of commissioners is unconstitutional; as this board, as organized, is not a court under the Constitution, and cannot, therefore, be invested with any of the judicial powers conferred upon the general government. Am. Ins. Co. v. Canter, 1 Pet 511, 7 Law Ed. 242; Benner v. Parter 8 How. 235 (13 L. Ed. 119; U. S. v. Ferreira, 13 How. 40, 14 L. Ed. 42.)

"But the answer to the objection is that the suit in the District Court is to be regarded as an original proceeding, the removal of the transcript papers and evidence into it from the board of commissioners being but a mode of providing for the institution of the suit in that court The transfer it is true is called an appeal; we must not, however, be misled by a name, but look to the substance and intent of the proceeding. The District Court is not confined to a mere re-examination of the case as heard and decided by the board of commissioners, but hears the case de nove, upon the papers and testimony which had been

used before the board, they being made evidence in the District Court; and also upon such further evidence as either party may see fit to produce."

In the case of In re Initiative Petition (No. 23) 35 Okl. 49, 127 Pac. 862, the court had before it for consideration a statute which provided for the filing of the initiative petition with the secretary of state signed by a certain number of voters, and which gave the secretary of state the power to determine whether the signers were qualified voters, and provided for the appeal from his decision to the courts. The court held that the secretary of state did not exercise judicial power and that the fact that an appeal was provided for to the courts did not affect the nature of the power; that in the courts the case was to be tried de nove.

In the case of Cunningham v. N. W. Improvement Co., 44 Mont. 180, 119 Pac. 554, the court had before it for consideration a workmen's compensation act which placed the administration of the act in the hands of the state auditor, and authorized him to investigate the injury of employes and to determine the compensation, the compensation being fixed by statute and was dependent upon the nature of the injuries. The court held that the adjustment of claims under the statute was an administrative function, and not a judicial proceeding.

(6) From the foregoing authorities it is clear that the proceedings in question were not judicial, as that term is commonly understood; that the provisions in the statute providing for an appeal from the determination of such board to the district court did not alter the nature of the proceedings; that such board was a mere administrative agency created by the Legislature authorized to determine in the first instance the validity and the legality of the claims against the state covered by the act.

Consequently it necessarily follows that false pretenses could be made to such board, or to the state through such board, and the court properly overruled the demurrer to the indictment.

It is next argued that no presentation or pretenses of any kind were ever made by appellant or any one for him to the board of loan commissioners, acting pursuant to law and in behalf of the state of New Mexico. Under this point it is contended that, by reason of the fact that Robert W. Lynn, cashier of the Santa Fé Bank, and who was the officer of the bank acting in the premises, did not go in person to the board of loan commissioners at the time of the presentment of said evidence of indebtedness, and make oral representations to the board concerning the validity of the instrument, the state failed to prove false pretense, even though bogus bond 254 was transmitted to the state of New Mexico for consideration by the board for refunding, accompanied by a letter of transmittal. There is, however, no merit in this contention. In fact it would be wholly immaterial as to whether any letter accompanied the bond. The question is, Was there a presentation to the board of loan commissioners, for payment or redemption, of the bogus bond under circumstances which would import a representation that it was a valid and subsisting indebtedness of the county of Santa Fé, and which the party was entitled to have redeemed by the board? There is a controversy between the state and the appellant as to the letter which accompanied the bond. The letter itself was put in evidence, as was a supposed copy of the letter incorporated into the record of minutes of the board of loan commissioners. There was a variance between such copy of the letter and the original, in that the original letter stated, "We herewith inclose for your consideration and action certain bonds and detach coupons," while, as copied into the record, the letter stated, "We here-

with inclose for your consideration and action certain detached coupons," omitting any reference to bonds. Accompanying the letter was a detached list of the indebtedness presented. Included in the list was county of Santa Fé bond 254.

Volume 2, Bishop's New Criminal Law, §430, lays down the rule as follows:

"With a few exceptions under statutes in special terms, it is immaterial to the pretense whether it is in writing, in oral words, by signs or conduct, or by any combination of parts of these; it is simply required that the idea be with due distinctness conveyed.  *   *   *   The uttering of a counterfeit note as a genuine one carries with it by implication a representation that it is genuine." See cases cited under note 5.

Volume 2, Wharton's Cr. Law (11th Ed.) §1434, states:

"Conduct is a sufficient pretense. The conduct and acts of the party will be sufficient, without any verbal assertion, and words written or spoken, imperfectly setting forth a pretense, may be supplemented by proof of facts completing the false pretense.  *   *   *   The mere passing business paper, also, at its nominal value, is an affirmation that such value is real."

Mr. Wharton, in the same work, further lays down, in section 1425, that it is obtaining money by false pretenses generally to pass spurious notes or coins if goods or money be obtained thereby. 12 R. C. L. p. 152, states:

"The true rule seems to be that the mere offer of the false instrument with fraudulent intent constitutes an uttering or a publishing, the essence of the offense being as in the case of forgery, the fraudulent intent, regardless of its successful consummation."

In this case no heed need be paid to the contention that the state is bound by the recitals in the record, to the effect that the letter, purporting to transmit the evidences of indebtedness, refers only to coupons, and does not mention bond 254, for, if the state is bound by the record, the defendant would

be likewise bound; and if the defendant is bound, then he would be concluded by the recital in the record to the effect that bond 254 was presented with the letter. It would be wholly immaterial whether the letter mentioned the bond; if it was included in the list of indebtedness transmitted with the letter, the presentation would be as complete as if it had been mentionel in the letter itself. It is the presentation for payment, or refunding under circumstances which imply a representation as to its validity, which makes out the offense. As we have seen from the authorities the mere presentation of spurious evidence of indebtedness for payment, and the obtaining of money thereon, makes out the offense, unless all the facts and circumstances in evidence would tend to show that there was no intent to deceive. Take, for example, the case of an individual who might obtain a forged order on a merchant for the delivery of goods, on the credit of the forged payee. He presents the order to the merchant without any explanation or representations, and the merchant fills the order. Would not such individual be as guilty of obtaining money by false pretenses as though he had said to the merchant: "This order is valid and binding; I saw the payee sign it and he delivered it to me." It is the presentation with intent to deceive, and under circumstances calculated to deceive, which makes out the offense.

It would necessarily follow that, if appellant had knowledge of the invalidity of bogus bond 254, and authorized the Santa Fé Bank to present the same to the board of loan commissioners for refunding, the mere presentment of said bogus bond was false pretense.

(7) Under this same point it is argued that, the state board of loan commissioners held no meeting of the board on June 3, 1916, the date named in

the record as the meeting of the board and the consideration of the evidences of indebtedness, and providing for their refunding or payment; that Frank Marron, deputy state treasurer, presented the evidences of indebtedness and the minutes first to one member of the board and then to the other members, and that by reason thereof no false representations could be or were made to the board, because a false representation could not be made to individual members of the board. There was proof in the record, however, to the effect that the board did meet on the 3d of June and acted as a board upon such matter. William G. Sargent, state auditor at the time, testified at one time during his examination as a witness, that there were no meetings of the board as such, but that Frank Marron, deputy state treasurer, made up the minutes and carried them around, together with the evidences of indebtedness, to the individual members of the board, and procured their signatures. It is argued, and correctly, that, where a duty is intrusted to a board composed of different individuals, that board can act officially only as such, in convened session, with the members, or a quorum thereof present. But Mr. Sargent also testified to other facts which would, however, authorize the jury to infer that there had been a meeting of the board on June 3, 1916. Hon. Frank W. Clancy, who was Attorney General at the time and a member of the board, had no distinct, personal and independent recollection of the matter, but based his evidence wholly upon the recitals in the record, and testified that he would not have signed the record unless satisfied that it spoke the truth. Mr. O. N. Marron, state treasurer at the time, and the third member of the board, testified positively that there had been a meeting of the board on June 3, at which he was present when this matter in question was considered, and that it was considered by the board in its official capacity. Some two or three days later Mr. Mar-

ron. was recalled to the stand and testified that he had been mistaken in his former testimony; that he was not even in the city of Santa Fé on June 3; that he left Santa Fé on the evening of the 2d of June, and consequently all his former testimony as to what occurred was incorrect, but, as we shall see in a later portion of the opinion, it was for the jury to say whether his first testimony was correct or his subsequent testimony. Consequently, if it be conceded that it was essential that there should have been a presentation of the claim to the board in formal session, there was substantial evidence before the jury of the fact that there had been such meeting, and such evidence is sufficient to support the verdict.

(8) The Attorney General contends that, even if there had been no meeting of the board, the conviction could be sustained under section 1604, which provides:

"In any case, when the intent to defraud is necessary to constitute the offense of forgery, or any other offense that may be prosecuted, it shall be sufficient to allege in the indictment an intent to defraud, without naming therein the particular person or body corporate intended to be defrauded; and on the trial of such indictment, it shall be sufficient and shall not be deemed a variance if there appear to be an intent to defraud the United States, or any state or territory, county, city or precinct, or any body corporate, or any public officer in his official capacity, or any copartnership or member thereof, or any particular person."

That under this statute it is not incumbent upon the state to allege in the indictment that the false pretense was made or bogus bond 254 was presented to the board of loan commissioners, or to any particular person, so that it got to the state with intent on the part of appellant to defraud the state. Further, that it was not incumbent upon the state to prove that the board of loan commissioners met in pursuance to law and passed upon said bogus bond 254; that it was only incumbent upon the

state to allege that there was an intent on the part of Kelly to defraud the state by the presentment of the bond and to prove that the bond was bogus, and that appellant knew it and received a part of the spoils from the fraudulent transaction, citing in support of his contention State v. Pilling, 53 Wash. 464, 102 Pac. 230, 132 Am. St. Rep. 1080; State v. Ice & Fuel Co., 166 N. C. 366, 81 S. E. 737, 52 L. R. A. (N. S.) 216, Am. Cas. 1916C, 456. See, also, note to the case of Commonwealth v. Johnson, 167 Ky. 727, 181 S. W. 368, L. R. A. 1916D, 267, at page 270, for note. But, in view of the holding that there was substantial evidence of the fact that the board did meet, we do not find it necessary to determine this question.

It is argued that, because the letter of transmittal by the Santa Fé Bank referred to indebtedness of the territory of New Mexico, and the board found that the evidences of indebtedness were of the county of Santa Fe, there was a variance. We fail to appreciate the force of this contention. The question for determination by the jury was whether there had been a presentation of bogus bond 254 to the board of loan commissioners for refunding under circumstances which constituted false pretenses. If bogus bond 254 actually accompanied the letter of transmittal, and was in fact the bond presented and intended to be presented by the letter, and the presentation of the bogus bond was at appellant's request, the fact that it was erroneously referred to as a bond of the territory of New Mexico in the letter would be wholly immaterial.

(9) It is earnestly insisted by the appellant that there was no proof that the Santa Fé Bank was the agent of William G. Kelly, nor that the said Santa Fé Bank with its full knowledge and consent made any representation to the said board of loan commissioners as to bond 254, set forth in the indict-

State v. Kelly, 27 N. M. 412

ment. Under this proposition it is first argued that
there is no evidence by any officer of the Santa Fé
Bank, or the Santa Fé Bank & Trust Co., or by any
other person, that the Santa Fé Bank was the agent
of William G. Kelly. The letter of transmit-
tal stated that the presentation was made on behalf
of Kelly & Kelly, of Kansas City, Mo. Appellant
was a member of this firm.

(10) It is argued that admissions, statements and
declarations of an agent are not admissible to prove
agency, and this proposition is correct. There must
first be prima facie proof of agency before such
declarations or statements are admissible for any
purpose. While agency may not be proved by the
extrajudicial statements and declarations of one pre-
tending to act as agent the fact of agency when it
rests in parol, may be established on the trial by the
testimony of the agent himself. See note to the
case of Dispatch Printing Co. v. National Bank of
Commerce, 5 A. R. C. 218. The note will be found
on page 224. Many cases are cited in support of the
proposition, and we know of nothing to the contrary.
Another general rule may be stated, which is that
the existence of an agency may be shown by, or in-
ferred from, circumstantial evidence. See cases cit-
ed in note to the case of Frank v. Board of Educa-
tion, 5 A. R. C. p. 155. The note will be found on
page 161. With these two rules stated, it will be
necessary to review the evidence to determine
whether appellant's contention is correct. The di-
rect evidence of agency for Kelly, if such has been
established, is afforded by the testimony of Robert
W. Lynn, who was cashier of the bank at the time
of the presentation of the bond in question. Almost
three years had elapsed between the time of the pre-
sentation of the bond and the trial. The cashier of
the bank had handled many thousands of transac-
tions in the interval. His memory was naturally
not very clear on the facts and circumstances at-

tending the presentation of the bond. He testified that some one other than himself, or any one connected with the bank, prepared the letter which accompanied the bond; that all he did was to sign the letter. Mr. Lynn testified on cross-examination in part as follows:

"Q. You have no definite recollection of the manner in which this paper was transmitted, if it ever was transmitted, to the board of loan commissioners, have you—or to the treasurer? A. Do you want me to explain the regular routine it would go through?

"Q. Yes; you may do that, but my question first I would have answered. A. I have no definite recollection.

"Q. Do I understand that your best recollection is that the paper reached your hands with the certificate by Mr. Edwards upon it already written and signed? A. I do not state that as a fact, but it is my recollection.

"Q. Did Mr. Kelly, so far as you know, ever see this paper in your possession? A. I don't think he did.

"Q. That circumstance that you had no written copy of this letter in your bank, does it not refresh your memory or enable you to say more positively how this letter came to be presented to you for signature? A. I can't state definitely. I can state in a roundabout way my idea.

"Q. That would only be an impression, except what you have said with reference to your belief that Mr. Edwards gave it to you? A. I did not say it was my belief that Mr. Edwards gave it to me.

"Q. I mean that his name was on it when you got it. You are able to say positively that you did not get this derect from William G. Kelly or from Kelly & Kelly? A. To the best of my belief I did not.

"Q. Are you able to say, Mr. Lynn, that, when this letter was presented to you, you accepted it as a mere matter of collection business, assuming that it came into your hands by some proper authority? A. That is correct.

"Q. But what that authority is or what it was you can not recall now; that is, who vouched for this letter; that you cannot say? A. I believe I considered this letter a matter of form necessary for the collection of the items attached.

"Q. Are you able to say, in view of the fact that you cannot recall the items, whether those items were attached and listed with the list mentioned in the letter was brought to you? Briefly ,was the letter with the attached items and

list brought to you at the same time? A. I can't say definitely. I think they were.

"Q. Under all these circumstances are you able to say that you had or had not any authority from Kelly & Kelly with reference to this transaction whatever it may be mentioned in the letter of June 2d, Plaintiff's Exhibit No. 6? A. I believe I did.

"Q. From whom? A. From W. G. Kelly.

"Q. Now, in reference to what was that? Can you tell by that letter? A. To the best of my memory Mr. Kelly instructed me to submit these items when called upon.

"Q. But what items are referred to in this letter of June 2d you don't know? A. I have no definite knowledge of those items."

Later Mr. Renehan made the following suggestion in the record:

"If the court please the witness has testified he did not know this particular transaction, but that he had permission from Kelly to submit matters."

Whereupon the witness followed.

"I don't believe I so testified in my answer. I said I had instructions from Mr. Kelly on this particular matter.

"Q. Now what particular matter did you refer to? A. To the items covered by that letter.

"Q. Now, what were those items? A. I don't know. I mean I have no definite description and can give no definite description.

"Q. You don't know whether or not the letter ever reached the board of loan commissioners? A. I have no knowledge of that letter after it was sent by the bank to the office of the state treasurer."

It will be observed that the witness testified that he had instructions from Kelly to submit the items covered by the letter, or submitted with the letter, when called upon, and that he had instructions from Kelly on this particular matter. We thus have direct evidence of the agent of the fact of agency, and in addition to this we have a circumstance which tends very strongly, indeed, to establish the fact of agency. In refunding the evidence of indebtedness

submitted to the board by the Santa Fé Bank, acting through its cashier, the board issued four bonds, each of $1,000, and a state warrant in favor of Kelly & Kelly for $682. This state warrant represented the amount due under the transaction, less than $1,000. It was the practice of the state loan board to issue only bond in $1,000 units, and to liquidate in cash the old amount. This warrant was received by Kelly and indorsed, and on the trial it was admitted by the counsel for appellant that he had received a warrant and obtained the proceeds. Such being true, it would be somewhat difficult to understand why appellant obtained the amount and appropriated it to his own use, and made no inquiry whatever as to the reason for the payment. But it is argued that some valid evidence of indebtedness was presented, and that this warrant might have come from such indebtedness, but, again, there is no showing that at that time Kelly had before the board for consideration valid indebtedness amounting to the face value of the warrant. There is another circumstances, and that is that Kelly knew where the original bond 187, from which the bogus bond was made, was located. By wire he requested the Capital City Bank of Santa Fé to buy this bond from a given bank in New York City, which was done. The Santa Fé Bank had theretofore presented for Kelly other matters to the board of loan commissioners for refunding. All these facts and circumstances and the direct evidence of Mr. Lynn were amply sufficient to establish the fact that, whatever Mr. Lynn purported to present on behalf of Kelly & Kelly, he had authority and directions from Kelly to do. Appellant argues that at most the Santa Fé Bank was simply a carrier, and did not act in the capacity of agent, but Lynn's testimony shows that he was instructed by Kelly to submit the items to the state treasurer. This, if true, clearly established the relation of principal and agent, and, as we have seen, the submission of the

bond for consideration and refunding necessarily constituted the representation as to its legality and validity.

It is further argued that the bank acted for Kelly & Kelly, a copartnership, and that William G. Kelly, appellant, personally may have had no connection with the fraudulent transaction; that, in order to render him criminally liable, it would be necessary to show personal participation; but this argument, in view of Mr. Lynn's testimony wherein he stated that he had instructions from William G. Kelly to submit these items, is without basis upon which to rest.

There is one other question in this case which requires consideration, and that is the inability of Mr. Lynn to recall the items which he submitted with the letter to the board of loan commissioners. We must begin with the proposition that, whatever he did submit, he was authorized by Kelly to do so.

(11) The next question for consideration is whether the evidence shows that at the time in question he submitted bogus bond 254 to the board of loan commissioners. In other words, then, having stated that whatever he submitted with the letter of June 2d he was instructed by Mr. Kelly to submit, we must next determine whether the evidence shows that bogus bond 254 was submitted with the letter of transmittal. First, we have the record made by the board of loan commissioners showing that this bond was included in the list of items accompanying the letter. Next we have the testimony of O. N. Marron in which he says he was present at the meeting of the board; that bond 254 was presented with the letter and included in the list of indebtedness which accompanied the letter; that it was presented by the Santa Fé Bank; that there was no territorial bond presented with the letter, but that county of Santa Fé bond 254, the bogus

bond in question, was the one presented. Then we
have the testimony of William G. Sargent, state aud-
itor, to the effect that on June 3, 1916, a letter of
transmittal from the Santa Fé Bank was presented
to the board, together with coupons and one bond,
No. 254. Mr. Sargent further testified that there
was no other letter of that date, or near that date,
from the Santa Fé Bank presenting any other evi-
dence of indebtedness. It is true that the effect of
Sargent's testimony was greatly impaired by other
evidence given by him to the effect that there was
no meeting of the board and that he was testifying
largely from the record as made by the board. Then
we have the testimony of Hon. Frank W. Clancy to
the effect that at the time he signed the minutes he
was satisfied that they spoke the truth; but, elimi-
nating both the testimony of Mr. Sargent and Mr.
Clancy, Mr. Marron's testimony is sufficient to sup-
port the verdict, if believed by the jury. His testi-
mony being vital upon two points of the case, it is
argued by the appellant that it should be wholly
eliminated from the case, because, after testifying
positively upon the two propositions as we have
seen, he was some two days later recalled to the
stand and further cross-examined, at which time he
stated that he had been mistaken in his former tes-
timony; that he was not in Santa Fé on June 3d,
did not attend the meeting of the board, and knew
nothing about the matter about which he had tes-
tified.

The general rule is that the credibility of wit-
nesses is in all cases a question for the jury, and it
is said in 38 Cyc. 1518 et seq. that this rule has been
applied where the testimony of a witness is contra-
dicted or conflicts with testimony previously given
by him or conflicts with the statements previously
made by him, or is shaken on cross-examination, or
his testimony is given under circumstances such as
would naturally throw discredit on him. The jury

State v. Kelly, 27 N. M. 412

here had the right, if it so elected, to believe that Mr. Marron told the truth upon his first appearance upon the witness stand, and that his testimony given some two days later was untrue and unworthy of belief, or conversely; it had a right to believe his later statements to the effect that he was not present at the board meeting, was not in Santa Fé, and knew nothing about the transaction previously testified to by him. Many instances occur upon the trial where witnesses give contradictory testimony, but because of such contradictions we know of no rule which requires the court as a matter of law to withdraw the testimony, from the consideration of the jury. In the case of Bruger v. Princeton, etc., Ins. Co., 129 Wis. 281, 109 N. W. 95, it was contended that testimony of the plaintiff in the case should be disregarded because of prior inconsistent admissions, but the court held that it was for the jury. In the case of Van Salvellergh v. Green Bay Traction Co., 132 Wis. 166, 111 N. W. 1120, which was an action for damages for personal injuries, the court said that the witness had testified first in a contradictory way as to whether she saw the car before it reached her, and upon cross-examination testified that as it approached she was looking in the general direction from which it was coming, but did not see or hear it; following this with contradictory evidence as to whether she did or did not forget about the probability of a car coming. Later she testified that she was looking away from the car. The court said:

"Even in the case of an adult where he as a party testifies in a contradictory way in respect to a vital point in issue it is not necessarily fatal to the case; it is competent for the jury to say which of the two conflicting statements is correct. * * *

"So, notwithstanding the contradictory character of plaintiff's evidence it was proper to send the case to the jury on the subject of whether she was unmindful of the probability of a car approaching and did not see or hear one or look in

the direction from which the car was coming, from the time she started south on the crosswalk till she was struck."

In the case of People v. Chapleau, 121 N. Y. 266, 24 N. E. 469, appellant's counsel argued that the jury should not have been allowed to consider the testimony of two witnesses because they were perjured witnesses on their own showing. The court said:

"If this were true, it would be no reason for any such instruction by the court to the jury."

And further:

"The doctrine as to the treatment of testimony which is affected by contradictions and inconsistencies, or by evidence making its falsity manifest and establishing a consciousness in the witness of its falsity, has been much considered in the books. Opinions have not always been in accord, but the weight of authority was in favor of the general rule that the question of the credibility of a witness was one for the jury, and that the only exception to the rule was in cases where the discrepancies in the testimony were the result of deliberate falsehood. The Santissima Trinidad, 7 Wheat, 339; Conray v. Williams, 6 Hill, 444, 446; People v. Evans, supra; Wilkins v. Earle, 44 N. Y. 172; Pease v. Smith, 61 N. Y. 447; Place v. Minster, 65 N. Y. 80; People v. Petmacky, 99 N. Y. 415.

"But, since the enactment of section 714 of the Penal Code and section 832 of the Code of Civil Procedure, we must hold that a new rule obtains, and that the rule and policy of the law are to allow all testimony to go to and be weighed by the jury. By those sections, a person convicted of any crime is, notwithstanding, a competent witness in any cause or proceeding, civil or criminal; but proof of his conviction is allowed for the purpose of affecting the weight of his testimony. In People v. O'Neil, 109 N. Y. 251, 266, the court had refused to charge that, if the jury should find that certain witnesses had in their previous testimony, in respect to the same matters, committed willful perjury, the jury should wholly disregard their testimony given on the trial. This was held not to be error, and Andrews, J., said, in reference to the force of section 714 of the Penal Code: 'It would be manifestly absurd, in the sight of this statute, now to hold that an unconvicted perjurer was an incompetent witness, whose evidence could not be considered by the jury, when, under the statute, if he had been convicted, his evidence must be received and weighed by the jury. Here the witnesses in testifying to facts, of which upon the preliminary

State v. Kelly, 27 N. M. 412

examination they had denied knowledge, or which they had suppressed, may have been moved and deterred, as they swore they were, by motives of fright; and they appear to have been perfectly free from improper instigations, or motives to swear falsely. At any rate, it was for the jury to decide whether they were to be believed or not."

In the case of Williams v. D. L. & W. R. R. Co., 155 N. Y. 158, 49 N. E. 672, the action was for personal injuries, the plaintiff claiming that he had been knocked off a freight car while going under a bridge. On the first trial of the case the plaintiff testified that he had passed under the bridge regularly for three weeks and frequently on top of a box car. The accident occurred in the daytime, the bridge was in plain sight, and that, knowing the train was about to pass under it, he turned his back to it and was going to the rear of the car when he was struck. The case was reversed on the ground that plaintiff knew the danger. On the second trial plaintiff testified that prior to the accident he had never passed under the bridge in question on top of the box car, and that he did not know it was a low bridge. The trial court, because of his previous testimony, instructed a verdict for the defendant. The court said, after reviewing the authorities:

"In this case the plaintiff gave testimony which, if credited by the jury, would have entitled him to a verdict. The trial judge apparently did not credit it, and it is quite likely that his view of the testimony was the correct one, but the difficulty with the situation is that, under our method of procedure, it was the province of the jury, not the court, to say whether his testimony was entitled to belief."

The judgment was reversed.

A similar case is that of Odell v. Webendorfer, 60 App. Div. 460, 69 N. Y. Supp. 930. See, also, Voss v. Smith, 87 App. Div. 395, 84 N. Y. Supp. 471, and Murr v. Western Insurance Co., 50 App. Div. 4, 64 N. Y. Supp. 12.

It would follow from these authorities that, if the trial court was not authorized to take a case from

the jury where the plaintiff had testified directly
contradictory upon the first and second trials of the
case, he would not be justified in so doing where the
contradictory evidence was given upon the same
trial.  It thus follows that there was ample evi-
dence by the testimony of Marron alone, if it were
believed by the jury, to establish the fact that bond
254 was submitted, together with other evidence of
indebtedness, with the letter of June 2.  There was
in addition the circumstantial evidence afforded by
the fact that Kelly, without question, accepted the
warrant issued for $682.20, which grew out of the
presentation of the items accompanying the letter.

We cannot appreciate the force of the argument
advanced by the appellant to the effect that the
bond on its face was prima facie evidence of a valid
and subsisting indebtedness of the county of Santa
Fé, and that the question as to whether it was or
was not was a question of law for the board to de-
cide, and that false pretense could not be predicated
upon a question of law.  It was a question of fact
for the board to decide whether the bond was a
forged bond or otherwise.  Of course, if it was a
forged bond as a matter of law, necessarily there
was no liability on the part of the county, but it
certainly was a false pretense to hold out the bond
to such a board as a genuine bond of the county of
Santa Fé.

It is next argued that there was no evidence that
the defendant directly or indirectly procured the
Santa Fé Bank, or any other person, to make any
false pretenses to the board of loan commissioners,
nor that the defendant had any knowledge thereof,
or consented thereto.  There were facts and circum-
stances in evidence from which the jury could prop-
erly infer that appellant knew that the bond in ques-
tion was a spurious bond.  There was evidence also
that he had in his possession other spurious evi-
dence of indebtedness against the county of Santa

Fé in the form of bonds. If he procured the Santa Fé Bank to present this bond to the board of loan commissioners for refunding, it would necessarily follow that the mere presentment of the bond, under the authorities heretofore cited, would constitute false pretense.

(12) It is next argued that the court erred in setting cause No. 4212 (the case in question) for trial over the objection and protest of the defendant. The facts out of which this contention arose are as follows: Appellant had been theretofore indicted for the same offense under an indictment, No. 4172, and had been indicted at the same time for several other offenses of a like nature. This was some three or four months prior to the trial in question. There were some technical defects in the first indictment, or at least the state was doubtful as to the advisability of proceeding to trial under the first indictment. The cases had all been set for trial, and the state elected to reindict the defendant, which was done on the 31st day of March, 1919. The court set the case for trial on the next day. When the case was called to trial appellant filed objection and protest to proceeding to trial, claiming that, by the fact of the case having been set for trial on the next day, appellant was deprived of his constitutional right to be aided and assisted by counsel, and present witnesses in his defense. In 21 Ency. of P. & P., p. 975, it is said:

"The trial court or judge is vested with a large discretion in the conduct of the trial of causes, and an appellate court will not interpose to control the exercise of such discretion by a court of original jurisdiction unless there has been an abuse or a most unwise exercise thereof."

In Wartena v. State, 105 Ind. 445, 5 N. E. 20, the court said:

"It is nevertheless the undoubted province of the nisi prius courts, in the exercise of a sound discretion, to regulate the course of business during the progress of trials. Included

in this is the right, during the term, in a proper way, to control its own sittings."

That case had to do with the holding of night sessions over the objection of counsel for appellant, and in the light of the facts it was held the court did not abuse its discretion. In State v. Silvius, 22 R. I. 322, 47 Atl. 888, three cases were set for trial for the same day against the defendant. The third case on the calendar was tried first over objection. It was held under the practice of that state that such action was permissible, the court saying:

"The defendant having been duly notified that all the indictments against him were down for trial on the day in question, he was bound to be ready, or to show good cause why he was not."

In the case of State v. Parry, 26 N. M. 469, 194 Pac. 864, there were three cases against the defendant, and the court first called the last numbered case for trial over the objection of the defendant. The court said:

"The power to regulate the order of precedence in the trial of cases rests in the discretion of the trial court, and the defendant, in the absence of a showing of diligence, can not complain of the taking up for trial of the last of three cases set for trial on the same day, instead of one of the other two cases."

There was no showing that any additional witnesses were required in order to enable appellant to present his defense, whose testimony could be procured by a delay. No motion for a continuance was filed. The fixing of a time for trial in a case rests in the discretion of the trial court, and in the absence of a showing of prejudice, the action of the court in the matter will not be interfered with on appeal. There was no showing of prejudice in the instant case.

(13) It is next urged under this proposition that the court set cause No. 4212 for trial in violation of

the provisions of section 5901, Code 1915. This section reads as follows:

"That is shall be the duty of the judge of each district court to fix a day for the trial of each criminal case in the district court, which day shall not be earlier than the third day of the term, and shall be fixed by the judge, not less than 20 days before the first day of the term at which it shall be tried, except that no date shall be fixed for the trial of any criminal case which the judge has reason to believe will not be tried at such term, and witnesses summoned on behalf of the state in any case so fixed for trial shall be summoned to appear at the courthouse of the proper county at 9 o'clock a. m. of the day in which said cause shall be fixed for trial, to testify in behalf of the state in such cause."

The statute is only directory. If it were held to be mandatory then no case could be tried during the term at which an indictment was returned, and it has always been the practice in all the district courts of the state to set cases for trial during the term at which the indictment was returned.

It is next argued that the court erred in refusing to give each of the 26 instructions upon defendant's theory of the case. Counsel for appellant say:

"It would be but duplicating argument and re-writing authorities to treat each of these instructions separately as the principle of law involved in the instructions are identically the same as the principles of law involved in the motion to instruct the jury to return a verdict of not guilty, and the demurrer to the indictment."

We have reviewed the law applicable to the propositions under which appellant says the instructions should have been given and have determined the same adversely to appellant's contention. Consequently it is unnecessary to treat the instructions separately, and appellant has not done so. It follows that there was no error in refusing the instructions.

(14) Appellant contends that the court erred in giving two instructions to the jury, as follows:

"If each and all of the material allegations of the indictment as stated in the last preceding paragraph, to wit, par-

agraph 6, have been established by the evidence to your satisfaction and beyond a reasonable doubt, you will find the defendant guilty as charged in the indictment; but if you have a reasonable doubt as to whether said material allegations, or any one or more of them, have been established, you will find the defendant not guilty."

"The defendant is presumed by the law to be innocent, and that presumption remains with him until his guilt is established by the evidence beyond a reasonable doubt of the offense charged against him, and it devolves upon the state to establish the guilt of the defendant beyond a reasonable doubt before you would be warranted in depriving the defendant of the benefit of this presumption and to find him guilty, and if you have a reasonable doubt of the defendant's guilt you should acquit him."

Appellant insists that in both these instructions the court told the jury that, if there was a reasonable doubt of defendant's guilt, they should acquit him. The instructions in question are the usual ones given and have been approved by many courts as shown in 2 Brickwood-Sackett's Instructions, § 2634.

Complaint is made because the court, during the examination of the state's witness, Ignacio Lopez, at the suggestion of the district attorney, sent the jury out and permitted the state to interrogate such witness in the absence of the jury for the purpose of refreshing his recollection. The witness was being interrogated as to his signature upon bond 187 and other evidences of indebtedness issued by the county of Santa Fé, together with the signature of two members of the board of commissioners on such bond. This, as stated, was for the purpose of establishing the genuine signatures of these people for the purpose of comparison, the object being to show that the signatures were forged to bond 254. The witness failed to testify positively to the signatures, and, after the jury retired, the state interrogated the witness as to whether he had not stated to counsel for the state theretofore that the signatures were genuine. The attorneys for the defend-

ant, when the examination was begun, interposed this objection:

"To which line of examination we object at this time in the condition the record shows the proceedings to be."

And later the objection was interposed that the procedure was improper. In his brief in this court counsel for appellant contents himself by saying:

"We will not attempt to cite authorities to the court on the proposition that the foregoing procedure is absolutely unheard of, but we will state that the correct procedure is, if the state has been surprised or a witness has become adverse, that the state should claim the right in the presence of the jury to cross-examine that witness, and when such right is given, to proceed with such cross-examination and let the jury see in just what manner the witness has given it."

(15) If the procedure adopted by the trial court in the present case violated any of the defendant's rights, it was the duty of counsel for appellant to point out to this court wherein he was injured or his rights violated. It is fundamental that an appellate court will not search for reasons to reverse a case; that the duty rests upon an appellant to clearly show that error has intervened to his prejudice. It is not argued by appellant that his constitutional right of trial by jury was violated by the procedure adopted. Further, it was later admitted by counsel for appellant in open court, in the presence of the jury, that bond 254 was not a genuine bond. The examination of Lopez was only preliminary to establishing that fact, and in view of the admission we fail to see how defendant's rights were prejudiced, unless it be that a constitutional right was violated, which is not contended by appellant.

The contention is made by appellant to the effect that error was committed in the introduction of evidence. For example, he contends that the court permitted the prosecution to offer in evidence, over the

objection of the defendant, evidence out of its proper order. The order of proof rests in the discretion of the trial court, and it is a frequent occurrence for the court to permit the introduction of evidence which properly should go later, upon the assurance of the state that the preliminary proof will be forthcoming. There was no error in this regard. Many of the objections to the introduction of evidence were based upon propositions of law heretofore in this opinion decided adversely to appellant, and require no further discussion.

Finding no error in the record, the judgment will be affirmed, and it is so ordered.

RAYNOLDS and PARKER, JJ., concur.